# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Bobby Wayne Stone, Petitioner,

v.

State of South Carolina, Respondent.

Appellate Case No. 2013-001968

---

## ON WRIT OF CERTIORARI

---

Appeal from Sumter County
R. Markley Dennis, Jr., Trial Judge
Howard P. King, Resentencing Judge
Michael G. Nettles, Post-Conviction Relief Judge

---

Opinion No. 27701
Heard March 23, 2016 – Filed February 8, 2017

---

## AFFIRMED

---

Emily C. Paavola, of Justice 360, of Columbia, and John H. Blume, III, of Cornell Law School, of Ithaca, New York, for Petitioner.

Attorney General Alan McCrory Wilson, Chief Deputy Attorney General John W. McIntosh, Senior Assistant Deputy Attorney General Donald J. Zelenka, and Assistant Attorney General Alphonso Simon, Jr., all of Columbia, for Respondent.

---

**JUSTICE FEW:** Bobby Wayne Stone shot and killed Charlie Kubala of the Sumter County Sheriff's Office. After we affirmed his murder conviction and death sentence, Stone filed an application for post-conviction relief (PCR) alleging he received ineffective assistance of counsel. The PCR court denied relief. We granted certiorari, and now affirm.

## I.    Facts and Procedural History

Stone began the day of February 26, 1996, by purchasing beer and two firearms—a .410 bore shotgun and a competition-grade .22 caliber semi-automatic pistol. He spent the remainder of the day roaming through the woods, drinking the beer and shooting the guns. Later that afternoon, Stone wandered into the backyard of Ruth Griffith. In Stone's statement to the police, he said he and Griffith were "old drinking buddies." Griffith denied that, and claimed she knew Stone only because he previously dated her niece and had been to Griffith's house to pick up her niece. Griffith's adult daughter, Mary Ruth McLeod, was living with Griffith and was at the house when Stone arrived. McLeod asked Stone—who was standing in the yard holding a beer can and his newly-purchased pistol—to leave the property. Stone complied, but McLeod had already called 911. Sergeant Charles Kubala arrived at Griffith's house at 6:06 p.m. By then, Stone had returned to the woods, so Sergeant Kubala checked the scene, spoke with McLeod and Griffith, and left.

A short time later, Griffith heard gunshots in her yard and then someone banging on the inside door of her side porch. McLeod had left the house, so Griffith called her neighbor—Landrow Taylor—who came over and called 911 from inside Griffith's home. Sergeant Kubala once again responded to the call, arriving at 7:07 p.m. Stone was still on the side porch, banging on the door and holding his pistol in his hand. Taylor and Griffith remained inside while Sergeant Kubala went around the house toward the side porch. From inside, Taylor and Griffith heard someone yell "halt" or "hold it," followed immediately by three or four gunshots. Stone struck Sergeant Kubala with two of the shots—once in the neck and once in the ear—and Sergeant Kubala died on the scene.

After hours of searching, Sumter County Sheriff's officers found Stone in the woods, lying motionless between two logs with the murder pistol beneath his body. Early the next morning, Stone gave a statement in which he confessed to the shooting. He claimed it was an accident, however, explaining, "I just turned from the house door and the gun went off on the porch and I ran."

At the 1997 trial, Stone was represented by Cameron B. Littlejohn Jr. and James H. Babb. The jury convicted Stone of murder, first-degree burglary, and possession of a weapon during a violent crime. The jury found the statutory aggravating circumstance for the murder of a law enforcement officer and recommended Stone be sentenced to death. We affirmed Stone's convictions, but reversed his death sentence and remanded the case for a new sentencing proceeding. *State v. Stone*, 350 S.C. 442, 567 S.E.2d 244 (2002). In the 2005 resentencing proceeding, he was again represented by Littlejohn and Babb. For the second time, the jury recommended Stone be sentenced to death. On appeal, he was represented by Joseph L. Savitz III. We affirmed the death sentence. *State v. Stone*, 376 S.C. 32, 655 S.E.2d 487 (2007).

Stone filed an application for PCR alleging he received ineffective assistance of counsel during his 1997 trial, his 2005 resentencing proceeding, and his subsequent appeal. The PCR court denied relief on all claims.

Stone filed a petition for a writ of certiorari, which we granted as to three sets of issues: (1) whether Stone's trial and appellate counsel were ineffective in dealing with victim impact evidence, (2) whether Stone's trial counsel was ineffective in investigating and presenting evidence of brain damage, and (3) whether Stone's trial counsel was ineffective in investigating and presenting evidence of the accident theory of the case. We affirm as to all issues.

## II. Sixth Amendment

The Sixth Amendment guarantees every criminal defendant the reasonably effective assistance of counsel. U.S. CONST. amend. VI.; *Strickland v. Washington*, 466 U.S. 668, 683, 104 S. Ct. 2052, 2061, 80 L. Ed. 2d 674, 691 (1984); *Von Dohlen v. State*, 360 S.C. 598, 603, 602 S.E.2d 738, 740 (2004). We measure counsel's performance by "an objective standard of reasonableness." *Weik v. State*, 409 S.C. 214, 233, 761 S.E.2d 757, 767 (2014) (quoting *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535, 156 L. E. 2d 471, 484 (2003)). As we analyze whether Stone's counsel met the Sixth Amendment standard, the law requires we presume counsel rendered adequate assistance and exercised reasonable professional judgment. *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066, 80 L. Ed. 2d at 695; *Ard v. Catoe*, 372 S.C. 318, 331, 642 S.E.2d 590, 596 (2007). To overcome this presumption and prevail on his ineffective assistance of counsel claim, Stone must satisfy the *Strickland* test, which requires that he prove: "(1) counsel's representation fell below an objective standard of reasonableness and (2)

but for counsel's error, there is a reasonable probability that the outcome of the proceeding would have been different." *Williams v. State*, 363 S.C. 341, 343, 611 S.E.2d 232, 233 (2005) (citing *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064, 80 L. E. 2d at 693).

### III.    Victim Impact Evidence

Stone makes two categories of arguments regarding the performance of his trial and appellate counsel as to the admissibility of victim impact evidence offered by the State during the resentencing proceeding.  First, he argues trial counsel was ineffective in not objecting to portions of the testimony of law enforcement officers the State presented as victim impact evidence.  The second category relates to the testimony of Teresa Kubala-Hanvey, Sergeant Kubala's widow.  Kubala-Hanvey testified she attempted suicide after hearing this Court reversed the first death sentence and remanded for a new sentencing proceeding.  As to Kubala-Hanvey's testimony, Stone makes two arguments.  First, he contends trial counsel—while he did object—was ineffective in omitting several grounds for the objection.  Second, Stone argues his appellate counsel was ineffective in not addressing in his brief the only ground on which trial counsel objected.  As to both categories of arguments, we find Stone met his burden of proof under the first prong of *Strickland*, but not under the second prong.

### A.    Law Enforcement Officers' Testimony

The State offered seven victim impact witnesses during the resentencing proceeding.  Several of them were colleagues of Sergeant Kubala at the Sumter County Sheriff's Office.  These officers testified extensively about the impact of Sergeant Kubala's death on them personally, on the Sheriff's office generally, and on the community as a whole.  Stone argues five particular components of the officers' testimony were inadmissible, and contends his trial counsel was deficient in not objecting when the State offered each into evidence.  First, Major Gary Metts testified about a golf tournament organized in Sergeant Kubala's honor. Second, Major Metts explained that the tournament proceeds are used to fund college scholarships for the children of law enforcement officers killed in the line of duty.[1]  Third, Major Metts testified the Sheriff's Office maintained an "Explorer

---

[1] Stone actually argues four objectionable components, combining our first and second categories as one.  As our discussion of this issue will indicate, however, we believe we can more effectively analyze Stone's claims if we treat the golf tournament and the use of its proceeds as separate categories.

Group," a program designed to help children, for which Sergeant Kubala volunteered. Major Metts testified the program "collapsed" after Sergeant Kubala's death. Fourth, Captain Gene Edward Hobbs recounted to the jury how he went to Sergeant Kubala's house to tell Kubala-Hanvey about her husband's death. Fifth, Captain Hobbs described how the Sheriff's Office takes new recruits to visit the location where Sergeant Kubala died and to his gravesite to "talk about the consequences of the job."

Under South Carolina law, "victim impact evidence is relevant for a jury to 'meaningfully assess the defendant's moral culpability and blameworthiness.'" *State v. Hughey*, 339 S.C. 439, 457, 529 S.E.2d 721, 730-31 (2000) (quoting *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S. Ct. 2597, 2608, 115 L. Ed. 2d 720, 735 (1991)), *overruled on other grounds by Rosemond v. Catoe*, 383 S.C. 320, 330, 680 S.E.2d 5, 10 (2009). The State may present victim impact evidence for the purpose of demonstrating "the 'uniqueness' of the victim and the specific harm committed by the defendant." *Hughey*, 339 S.C. at 457, 529 S.E.2d at 730 (quoting *State v. Rocheville*, 310 S.C. 20, 27, 425 S.E.2d 32, 36 (1993)). In *State v. Bennett*, we explained that evidence of "the specific harm caused by the defendant" can "includ[e] the impact of the murder on the victim's family and 'a quick glimpse of the life which the defendant chose to extinguish.'" 369 S.C. 219, 228, 632 S.E.2d 281, 286 (2006) (quoting *Payne*, 501 U.S. at 825, 822, 111 S. Ct. at 2608, 2607, 115 L. Ed. 2d at 735, 733). Under *Payne*, "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar." 501 U.S. at 827, 111 S. Ct. at 2609, 115 L. Ed. 2d. at 736. However, when victim impact "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." 501 U.S. at 825, 111 S. Ct. at 2608, 115 L. Ed. 2d at 735.

We begin our analysis of whether counsel's performance was deficient under the Sixth Amendment for not objecting to these five components of testimony by observing that the "admission or exclusion of evidence" in a capital trial is within the "discretion of the trial court." *State v. Wise*, 359 S.C. 14, 21, 596 S.E.2d 475, 478 (2004). We have specifically applied that principle to the admission of victim impact evidence in the penalty phase, stating, "A trial judge has considerable latitude in ruling on the admissibility of evidence." *State v. Bixby*, 388 S.C. 528, 554-55, 698 S.E.2d 572, 586 (2010) (discussing our review of the trial court's decision to admit "a seven minute video showing portions of [the officer's] funeral"). In this context, we examine trial counsel's performance.

At the PCR trial, Stone's PCR counsel asked trial counsel whether he considered objecting to Captain Hobbs' testimony, to which he replied,

> I considered objecting to a lot of this, but Judge King was being very liberal in what he was allowing in from the standpoint of victim's testimony. I mean I felt if he allowed in what Ms. Kubala said about her reaction to the appeal that he was probably going to allow this in. I didn't want to be perceived by the jury as—as jumping up and objecting to everything like I was trying to hide something. So yes, I did consider it. I didn't consider my chances of winning that objection . . . to be very good and I mean there's a lot of leeway that the courts have allowed in—in this kind of testimony.

Stone's PCR counsel also asked trial counsel whether he considered objecting to Major Metts' testimony. He replied,

> I considered objecting to a lot of this, but I did not feel that the objection would be sustained. I didn't want to be perceived as—as trying to hide things and . . . I just think Judge King would have—would have let it in.

Trial counsel is repeatedly required during any trial—particularly a capital trial—to make split-second decisions on many subjects, including whether to object to testimony. There are a variety of reasons counsel may soundly choose not to make such an objection, including the reality that not all evidence offered by the State is harmful to the defendant. Under certain circumstances, therefore, counsel may employ a strategy of not objecting—even when counsel has a good argument for exclusion—if counsel reasonably perceives the benefits of doing so are outweighed by some other consideration. *See Watson v. State*, 370 S.C. 68, 72–73, 634 S.E.2d 642, 644 (2006) (finding counsel's performance was not deficient in making the decision not to object to "inadmissible" testimony because his strategy—that doing so "might lead to the more damaging introduction" of other evidence—was sound). The necessity of making these and other strategic decisions is part of the difficulty of trying any case, and these difficulties are intensified in a capital trial.

For these and other reasons, we defer to reasonable strategies employed by counsel at trial.  As the Supreme Court explained in *Strickland,*

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."  There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.

466 U.S. at 689, 104 S. Ct. at 2065, 80 L. Ed. 2d at 694-95 (citations omitted).

Stone argues trial counsel's decision not to object was an invalid strategic decision because the reasons counsel gave for employing the strategy were not sound.  As we have often stated, counsel's strategic decisions will not be found to be deficient performance if he articulates a valid reason for employing the strategy. *E.g., Smith v. State,* 386 S.C. 562, 567-68, 689 S.E.2d 629, 632-33 (2010); *Caprood v. State,* 338 S.C. 103, 110, 525 S.E.2d 514, 517 (2000); *Stokes v. State,* 308 S.C. 546, 548, 419 S.E.2d 778, 779 (1992).  The necessary converse of this principle is that counsel's decision to employ a certain strategy will be deemed unreasonable under the Sixth Amendment if the reasons given for the strategy are not sound. *See Dawkins v. State,* 346 S.C. 151, 157, 551 S.E.2d 260, 263 (2001) (finding counsel's performance was deficient in making a decision not to object to the admission of testimony when the underlying strategy was not sound).

Stone's trial counsel gave three reasons for not objecting to the law enforcement officers' testimony. First, trial counsel stated "Judge King was being very liberal in what he was allowing in from the standpoint of victim's testimony." Second, trial counsel stated—specifically as to Captain Hobbs—he "felt if [Judge King] allowed in what [Kubala-Hanvey] said about her reaction to the appeal that he was probably going to allow this in." Third, trial counsel stated he "didn't want to be perceived by the jury as . . . as jumping up and objecting to everything like [he] was trying to hide something." We agree with Stone that none of counsel's reasons for not objecting were sound strategic reasons.

As to the first reason, although the trial court has wide discretion in making a ruling on the admissibility of victim impact evidence, counsel has potentially good arguments for its exclusion. *See supra*, discussion of *Bennett*, *Hughey*, and *Payne*. This is particularly true when the State offers evidence that pushes the limits of permissible victim impact. *See United States v. Fields*, 516 F.3d 923, 947 (10th Cir. 2008) ("Including the community in the victim-impact inquiry is fraught with complication."). Of the five components of victim impact evidence to which Stone argues his counsel should have objected, we find the fourth component—Captain Hobbs' testimony about informing Sergeant Kubala's widow of his death—would almost certainly have been properly admitted. While we stress that such decisions are within the discretion of the trial court, we can hardly imagine a more direct impact of a victim's death than the events and circumstances surrounding his family learning of it. *See Bennett*, 369 S.C. at 228, 632 S.E.2d at 286 (explaining that permissible victim impact evidence includes "'the specific harm caused by the defendant,' including the impact of the murder on the victim's family").

On the other hand, we find the second component—the use of the proceeds from the golf tournament—and the fifth component—the testimony about taking new recruits to Sergeant Kubala's gravesite—are more likely to have been excluded. We find it difficult to relate this evidence to the definitions we have previously given of permissible victim impact evidence because these two components show primarily the general impact of Sergeant's Kubala's death on the community, as opposed to showing his unique qualities or a specific harm caused by the murder. *See supra*, discussion of *Bennett* and *Hughey*. *But see Bixby*, 388 S.C. at 556, 698 S.E.2d at 587 (finding the admission of victim impact evidence permissible "because it showed the traditional trappings of a law enforcement officer's funeral, demonstrating the general loss suffered by society").

The other two components—the golf tournament itself and the "collapse" of the "Explorer Program"—are close calls, subject to the discretion of the trial court. These two components do show more than the victim's uniqueness and the specific impact of the murder, but they also illustrate the qualities of Sergeant Kubala that made him special and unique. For instance, that his colleagues would hold a golf tournament in his honor, and his extensive involvement in the "Explorer Program" such that it could not continue in his absence, show the kind of person Sergeant Kubala was. *See Riddle v. State*, 314 S.C. 1, 11-12, 443 S.E.2d 557, 563-64 (1994) (holding testimony about victim's standing in the community was allowable "to establish the victim as a unique human being").

We do not intend with this discussion to define which of the five components would have been permissible for the trial court to admit within its discretion. Rather, we discuss them to demonstrate that, with varying degree, the admission of each one was debatable. Without an objection, however, there can be no debate; and the trial court has no opportunity to exercise its discretion. Here, even if the trial court was being "liberal" in allowing victim impact testimony, trial counsel should have objected to those components of the law enforcement officers' testimony as to which counsel felt he had a reasonably persuasive argument for exclusion. If he had objected in those instances, the trial court may have sustained the objection. But in any event, counsel would have at least tested the trial court's discretion. *See Ard*, 372 S.C. at 331, 642 S.E.2d at 597 ("When evaluating the reasonableness of counsel's conduct, 'the court should keep in mind that counsel's function . . . is to make the adversarial testing process work in the particular case.'" (quoting *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066, 80 L. Ed. 2d at 695)). The fact the trial court has such wide discretion does not justify the decision not to object. Rather, the debate that precedes the exercise of that discretion is part of the adversarial process *Ard* and *Strickland* require trial counsel to test.

In this case, counsel testified he made the decision not to object for reasons other than the strength of his argument for exclusion. In fact, we read counsel's testimony to say he made the decision not to object *despite* his belief that he had good grounds for the objection. A capital defendant would generally prefer to exclude victim impact evidence where possible because it is favorable to the State. This was not a situation in which trial counsel made several unsuccessful objections and then decided further objections were futile. Instead, the transcript reveals trial counsel did not make a single objection during either Major Metts' or Captain Hobbs' testimony. Under these circumstances, counsel's belief the trial court would overrule his objection does not justify the decision not to make it.

As to the second reason, trial counsel claims he did not object to Captain Hobbs' testimony, in part, because the trial court allowed Kubala-Hanvey to testify about her suicide attempt. This is not a valid explanation. In addition to the reasons we explained above, the transcript reveals Captain Hobbs testified the day before Kubala-Hanvey. The trial court's rulings during her testimony could not possibly have affected trial counsel's earlier decision not to object to Captain Hobbs' testimony.

Trial counsel's other explanation for not objecting—his concern the jury might think he "was trying to hide something"—is also not valid. *See Dawkins*, 346 S.C. at 157, 551 S.E2d at 263 (holding counsel's failure to object because he did not want to confuse or upset the jury was not a valid strategic decision); *Gallman v. State*, 307 S.C. 273, 276-77, 414 S.E.2d 780, 782 (1992) (holding trial counsel's failure to object because he did not want to "give the jury the idea that something was being hidden" was not a valid strategic decision). If trial counsel was truly concerned about the effect his objections would have on the jury, he should have sought a determination as to admissibility outside the jury's presence. *See Dawkins*, 346 S.C. at 157, 551 S.E.2d at 263 ("To eliminate the possibility of confusing or upsetting the jury, counsel could have sought a determination as to the inadmissibility of the . . . testimony out of the hearing of the jury . . . .").

Trial counsel failed to articulate any valid strategic reason for not objecting to important victim impact testimony the trial court had the discretion to exclude. Therefore, the decision not to object does not meet an objective standard of reasonableness, and Stone has satisfied the first prong of *Strickland*.

## B.    Testimony Regarding Widow's Suicide Attempt

In addition to the law enforcement officers, the State also called members of Sergeant Kubala's family to testify about the impact of his death. One of these witnesses was Teresa Kubala-Hanvey, his widow. Kubala-Hanvey testified about her relationship with Sergeant Kubala and the impact his death had on her and her children. Near the end of her testimony, the solicitor asked Kubala-Hanvey if there was "anything significant in your life that you'd like to tell the jury about?" Kubala-Hanvey responded, "I'm ashamed of it, but I'll tell them." She then narrated the events leading up to her suicide attempt. She testified,

> February the 11th, 2003, I woke up very depressed. They had called and told me that they were going to retry this case over again, that the supreme court had overturned it, and they called. They ended up having to, leaving a message. We had gone away. It was our first anniversary, Mike and I's first anniversary, and we had gone and taken the kids to the beach, and we got back on that first anniversary, that was on my answering machine, and so I had to deal with, and my husband, Mike, now he was working for UPS and got hurt on the job, and he was going through [workers' compensation] and stuff, and we were trying to sell his house because we had two house payments when we got married, and the UPS wouldn't take, take him back, so he lost his job and had to find another job, and everything just blew up. So that morning I got up, and Mike was still asleep.

At that point, Stone's trial counsel requested a bench conference, in which he made an off-the-record objection. After the bench conference, the trial court stated it would "allow the defense to put the matters on the record at a later time." Kubala-Hanvey continued,

> I decided I couldn't take any more, so I took the bottle of Tylenol PM and decided I was just going to end my life.

She went on to say attempting suicide was "stupid," her stint in the hospital as a result of the attempt was an "eye opener," and the experience made her realize she didn't "have [as] many problems as [she] thought she did."

After Kubala-Hanvey's testimony, the State called its one remaining witness and rested its case. Then the trial court allowed Stone's counsel to put his objection on the record. Counsel stated,

> It was apparent from her testimony that the causation factor there was not what had happened seven years earlier, but the fact that the legal proceeding was about to occur again. Your Honor, do you think the break in time, I mean the period from 1996 to 2003 certainly lessens the direct effect that she would otherwise be allowed to testify about. We think the fact that she was able to testify about this attempted suicide was extremely prejudicial to the defendant and that testimony should have been excluded.

The trial court ruled the objection was timely, but overruled the objection. The trial court stated, "I think that it was relevant, and for that reason I did overrule [your objection]."

On direct appeal to this Court, Stone argued the trial court erred by permitting the victim's widow to testify about her suicide attempt. 376 S.C. at 33, 655 S.E.2d at 487. In his brief, Stone's appellate counsel stated the issue as, "Did the victim's widow's testimony regarding her suicide attempt impermissibly inject an arbitrary factor into the jury's deliberations?" in violation of South Carolina Code subsection 16-3-25(C)(1) (2015).[2] 376 S.C. at 35, 655 S.E.2d at 488. The Court stated Stone's "argument before this Court goes along quite different lines" from the argument Stone made at trial, and on this basis found the issue unpreserved, and affirmed. 376 S.C. at 35-36, 655 S.E.2d at 488-89.

Stone contends trial counsel—while he did object—was deficient in omitting several grounds for the objection. Stone also argues his appellate counsel was

---

[2] Subsection 16-3-25(C)(1) requires that this Court "shall determine . . . [w]hether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor."

deficient in failing to brief on appeal the only ground on which trial counsel did object.  We agree that both trial and appellate counsel were deficient.  At a minimum, trial counsel should have objected to the testimony as impermissible victim impact testimony.[3]  *See generally Foye v. State*, 335 S.C. 586, 590, 518 S.E.2d 265, 267 (1999) (holding trial counsel was deficient in failing to preserve an issue for appeal).[4]  Appellate counsel was deficient for two reasons.  First, he failed to present the only argument trial counsel made.  *See generally Patrick v. State*, 349 S.C. 203, 209, 562 S.E.2d 609, 612 (2002) (finding "counsel was deficient in failing to adequately raise or address the merits of the issue" on appeal); *Simpkins v. State*, 303 S.C. 364, 368, 401 S.E.2d 142, 144 (1991) (stating "failing to raise [a meritorious] issue clearly establishes ineffective assistance"), *overruled on other grounds by State v. Stokes*, 381 S.C. 390, 403-04, 673 S.E.2d 434, 441 (2009).  Second, the only argument he did present was one this Court is already required to consider pursuant to subsection 16-3-25(C)(1).

Stone was entitled to have the admissibility of Kubala-Hanvey's description of her suicide attempt litigated before this Court on direct appeal.  His lawyers failed to place that issue before us.  We find this failure does not meet an objective standard of reasonableness, and Stone has satisfied the first prong of the *Strickland* test.

---

[3] According to the transcript of the resentencing proceeding, just before overruling trial counsel's objection, the trial court stated, "In my view [the suicide attempt] was partially related to the situation of . . . Sergeant Kubala, and I think he is the appropriately the victim in fact of testimony."  The second half of this sentence makes little sense, which causes us to wonder if the trial court actually stated something to the effect of, "I think this is appropriately victim impact testimony."  This does make sense, especially in the context of the court's overall ruling and trial counsel's argument that the murder did not cause the suicide attempt.  Even if this is what the trial court ruled, however, trial counsel was deficient in failing to make the proper grounds for the objection sufficiently clear that appellate counsel and this Court could see the correct objection was made.  This, in turn, should remind trial lawyers and trial courts of the dangers of off-the-record sidebar conferences on important issues such as objections to victim impact evidence.  *See York v. Conway Ford, Inc.*, 325 S.C. 170, 173, 480 S.E.2d 726, 728 (1997) ("An objection made during an off-the-record conference which is not made part of the record does not preserve the question for review.").

[4] Stone also argues trial counsel should have objected on the ground the testimony "improperly injected appellate review into the jury's deliberations," and appears to suggest two additional bases for objection, which we view as subparts of the argument the testimony was impermissible victim impact testimony.

## C.    Prejudice of Victim Impact Evidence

To demonstrate prejudice under the second prong of *Strickland*, Stone must prove that if counsel had not been deficient, "there is a reasonable probability the outcome of the proceeding would have been different."  *Williams*, 363 S.C. at 343, 611 S.E.2d at 233.  As to trial counsel's deficiency in failing to object to the testimony of Major Metts and Captain Hobbs and in failing to properly object to the testimony of Kubala-Hanvey, Stone would satisfy the second prong if he proved there is a reasonable probability that either (1) the trial court would have sustained an objection, which would in turn have changed the outcome of the resentencing proceeding, or (2) this Court would have reversed the death sentence on the basis of one of the preserved objections and remanded for a third sentencing proceeding.  As to appellate counsel's deficiency in failing to brief the objection trial counsel made, Stone would satisfy the second prong if he proved there is a reasonable probability that this Court would have reversed the death sentence and remanded for a third sentencing proceeding.  We find Stone did not prove prejudice under the second prong of *Strickland* as to any of these scenarios.

As to the outcome of the resentencing proceeding, we find that none of the five components of the officers' testimony, nor Kubala-Hanvey's testimony about her suicide attempt, were so compelling that the exclusion of the evidence was likely to result in the jury not making a recommendation of death.  The officers' testimony requires little explanation; we simply do not find it to be significant enough to change the jury's verdict if the jury had not heard it.

Kubala-Hanvey's testimony regarding her suicide attempt does warrant explanation.  We begin with the PCR court's finding that the testimony was "not unduly prejudicial."  While this finding is not dispositive as to whether it alone influenced the jury's decision, it is helpful to understanding whether the testimony was likely to improperly divert the jury away from its consideration of Stone's moral culpability and blameworthiness.  *See Hughey*, 339 S.C. at 457, 529 S.E.2d at 730-31 (stating "victim impact evidence . . . is only inadmissible where it is so unduly prejudicial that it renders the trial fundamentally unfair"); *State v. Byram*, 326 S.C. 107, 118, 485 S.E.2d 360, 366 (1997) (contrasting victim impact evidence that is "relevant for the jury to meaningfully assess appellant's moral culpability and blameworthiness" from evidence "so unduly prejudicial as to render [the] trial fundamentally unfair").  As the following discussion of our own findings demonstrates, there is ample evidence to support the PCR court's finding.

We find the exclusion of Kubala-Hanvey's testimony about the suicide attempt was not likely to have changed the result of the resentencing proceeding. First, Kubala-Hanvey explained several additional unrelated circumstances that caused her stress that day. Second, she testified her actions were "stupid" and that she later concluded, "I saw I don't have [as] many problems as I thought I did, as other people do. You always find people that are in worse shape than you are." If her testimony about her suicide attempt improperly exaggerated the effect the murder or the reversal had on her, this testimony diminished it. Finally, the suicide attempt was mentioned only once and the State did not address it at all during its closing argument.

As to whether this Court would likely have reversed the death sentence on the basis of a properly preserved and briefed objection, we begin our discussion with the same observation we made earlier: "A trial judge has considerable [discretion] in ruling on the admissibility of [victim impact] evidence." *Bixby*, 388 S.C. at 555, 698 S.E.2d at 586. PCR counsel argues, "A suicide attempt is on its face highly emotional. It was, in essence, a form of emotional blackmail for the jury, the subtext being that a decision for life may be unbearable for Kubala-Hanvey, causing her to attempt suicide again." The argument overstates the factual and contextual basis on which it is made. Even were we to find the admission of the testimony was an abuse of the discretion we give trial judges on victim impact evidence, Stone would still be required to demonstrate prejudice, *see State v. Byers*, 392 S.C. 438, 444, 710 S.E.2d 55, 58 (2011) ("To warrant reversal based on the wrongful admission of evidence, the complaining party must prove resulting prejudice.").

As we noted in *Hughey*, the Supreme Court set forth the standard for demonstrating prejudice as to victim impact evidence—"so unduly prejudicial that it renders the trial fundamentally unfair." 339 S.C. at 457, 529 S.E.2d at 731 (quoting *Payne*, 501 U.S. at 825, 111 S. Ct. at 2608, 115 L. Ed. 2d at 735). Applying this standard, we have affirmed trial courts' admission of victim impact evidence time and again. In *Bixby*, we affirmed the trial court's admission of a seven minute video showing footage of a slain officer's funeral as proper victim impact evidence. 388 S.C. at 555, 698 S.E.2d at 586. In *Hughey*, we affirmed the trial court's admission of narrative responses from family members describing their relationship with the victim as proper victim impact evidence. 339 S.C. at 457, 529 S.E.2d at 731. In *State v. Powers*, we affirmed the trial court's admission of testimony from the victim's wife and daughter regarding the victim's uniqueness

and the impact of his death on the family.  331 S.C. 37, 45-46, 501 S.E.2d 116, 120 (1998).  Applying the *Hughey* standard to the evidence in this case, we find we would not have reversed Stone's death sentence.  As we previously discussed, there are several reasons the evidence did not have the impact *Payne* and *Hughey* require for a demonstration of prejudice, not the least of which is Kubala-Hanvey's own testimony.  She immediately called her attempt "stupid" and explained to the jury, "I don't have [as] many problems as I thought I did, as other people do." Considering the context in which the testimony was given—as we must—we find Kubala-Hanvey's testimony was not so unduly prejudicial that it rendered the trial fundamentally unfair.  Therefore, we would not have reversed the death sentence on the ground the trial court admitted this testimony over a proper objection.

Stone also argues Kubala-Hanvey's testimony "improperly injected appellate review into the jury's deliberations," relying on *Caldwell v. Mississippi*, 472 U.S. 320, 105 S. Ct. 2633, 86 L. Ed. 2d. 231 (1985).  In *Caldwell*, the Supreme Court held "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."  472 U.S. at 328–29, 105 S. Ct. at 2639, 86 L. Ed. 2d at 239.  The district attorney in *Caldwell* was permitted—over opposing counsel's objection—to explain to the jury that their decision was "automatically reviewable by the Supreme Court."  472 U.S. at 325–26, 105 S. Ct. at 2638, 86 L. Ed. 2d at 237.  In ruling on the objection, the trial court stated—in front of the jury—"I think it proper that the jury realizes that [the sentence] is reviewable automatically as the death penalty commands."  472 U.S. at 325, 105 S. Ct. at 2630, 86 L. Ed. at 237. The Supreme Court explained that such "state-induced suggestions that the sentencing jury may shift its sense of responsibility to an appellate court" would result in "unreliability" and "bias in the favor of death sentences."  472 U.S. at 330, 105 S. Ct. at 2640, 86 L. Ed. 2d at 240.

The admission of Kubala-Hanvey's description of her suicide attempt bears little resemblance to what happened in *Caldwell*.  First, no one told this jury its sentence was automatically reviewable.  To the extent Kubala-Hanvey's testimony made any suggestion to the jury concerning appellate review, it was only by implication. Second, and more importantly, any suggestion the testimony made was not a "state-induced suggestion," and unlike *Caldwell*, the trial court did not comment on and validate such a suggestion.  Kubala-Hanvey's testimony did not inject appellate review into the jury's deliberations on any level close to what the prosecutor and

the judge did in *Caldwell*, and thus we would not have reversed Stone's death sentence on this ground.[5]

Despite proving instances of deficient performance by trial and appellate counsel regarding victim impact evidence, we find Stone has not proven a reasonable probability the outcome of the resentencing proceeding or the appeal from his death sentence would have been different. Thus, we find Stone did not satisfy the second prong of *Strickland*.

## IV. Evidence of Brain Damage and Intellectual Impairment

Stone argues trial counsel was deficient in not thoroughly investigating Stone's brain damage and in not presenting evidence of Stone's low intellectual functioning during the resentencing proceeding. At the PCR trial, Stone's counsel proved through expert testimony Stone suffers from brain damage and significant intellectual impairment. Appellate counsel in this appeal began her Statement of the Case in the Brief of Petitioner, "There is no dispute that Bobby Wayne Stone suffers from organic brain damage and intellectual impairment." The State did not contest this statement in its brief or at oral argument. We begin our analysis of this claim, therefore, with the recognition—in hindsight—that Stone does in fact suffer from organic brain damage and significant intellectual impairment.

Stone correctly argues "evidence of mental impairments such as brain damage or low intellectual functioning" has "powerful mitigating effect." *See Sears v. Upton*, 561 U.S. 945, 945–46, 130 S. Ct. 3259, 3261, 177 L. Ed. 2d 1025, 1028 (2010) (stating "significant frontal lobe brain damage" that caused "perform[ance] at or below the bottom first percentile in several measures of cognitive functioning and reasoning" is "significant mitigation evidence"); *Tennard v. Dretke*, 542 U.S. 274, 288, 124 S. Ct. 2562, 2572, 159 L. Ed. 2d 384, 397-98 (2004) ("Evidence of

---

[5] We also reject Stone's argument that Kubala-Hanvey's testimony was an improper opinion of what the appropriate sentence should be under *Booth v. Maryland*, 482 U.S. 496, 508–09, 107 S. Ct. 2529, 2535–36, 96 L. Ed. 2d 440, 451-52 (1987) (holding a witness' opinion as to what the appropriate sentence should be was inadmissible), *overruled in part by Payne*, 501 U.S. at 828-30, 111 S. Ct. at 2610-11, 115 L. Ed. 2d at 737-39, and his argument that her testimony was an inadmissible opinion as to the ultimate issue in the case under *Wise*, 359 S.C. at 27, 596 S.E.2d at 481 ("A capital defendant is prohibited from directly eliciting the opinion of family members or other penalty-phase witnesses about the appropriate penalty.").

significantly impaired intellectual functioning is obviously evidence that 'might serve "as a basis for a sentence less than death."'" (quoting *Skipper v. South Carolina*, 476 U.S. 1, 5, 106 S. Ct. 1669, 1671, 90 L. Ed. 2d 1, 7 (1986))); *Hooks v. Workman*, 689 F.3d 1148, 1205 (10th Cir. 2012) ("Evidence of organic brain damage is something that we and other courts, including the Supreme Court, have found to have a powerful mitigating effect." (citations omitted)).

The expert evidence presented at the PCR hearing places Stone's brain damage squarely in this category of powerful mitigating evidence. For example, Ruben C. Gur, Ph.D.—a neuropsychologist and professor at the University of Pennsylvania—performed an assessment of Stone's brain structure and function. Dr. Gur described numerous abnormalities in Stone's brain, including "abnormalities . . . in regions [of the brain] that are very important for regulating behavior," and stated "the kind of structural abnormalities observed in the frontal regions of Mr. Stone's brain interfere with executive functions such as abstraction and mental flexibility, planning, moral judgment, and emotion regulation . . . and impulse control." He further described a "reduced metabolism in the amygdala," which he called his "most striking finding." He stated,

> A damaged amygdala will misinterpret danger signals and when excited it will issue false alarms . . . . When Mr. Stone's amygdala becomes activated, his frontal lobe is unlikely to be capable of exercising control as a normal one would, because his frontal lobe is not only damaged but his cortex is already operating at full capacity in its hyper-vigilant state. The frontal lobe is unable to do its job and act as the brakes on . . . primitive emotional impulses . . . .

Fred L. Bookstein, Ph.D.—a University of Washington professor of morphometrics, which predicts patterns of behavior based on measurements of body parts—reviewed measurements of the parts of Stone's brain, particularly the corpus callosum. Dr. Bookstein concluded that abnormalities he found in these measurements would lead to "poor judgment" and "difficulties in impulse control."

Finally, Stone presented the testimony of James R. Merikangas, M.D.—a board certified neurologist and psychiatrist. Dr. Merikangas testified Stone suffers from "organic brain damage." He explained,

> [Stone's] brain is anatomically abnormal. His frontal
> lobes are smaller than normal. His ventricles, which are
> the fluid-filled spaces inside the brain, are abnormally
> large . . . . The ventricles enlarge in a condition called
> hydrocephalus, which is dripping water on the brain. But
> it's a sign that the brain has lost brain tissue or never had
> brain tissue to the extent that the space is filled with fluid
> in excess . . . . And the corpus callosum, which is the
> white matter track that connects the left hemisphere to
> the right hemisphere, in the case of Mr. Stone, has at
> least three different abnormalities . . . .

Dr. Merikangas further explained that as a consequence of this brain damage Stone has "cognitive problems and difficulty with impulse control." He continued,

> And the pattern of function in Mr. Stone's brain is
> distinctly abnormal. He has decreased functioning in the
> limbic system, the system that has to do with emotional
> control, and the amygdala, the system that has to do with
> reactions to fear, recognition, and startle.

Under cases like *Sears*, *Tennard*, and *Hooks*, Stone's trial counsel would have been obligated to present to the jury this evidence of brain damage and the effects it would have on his behavior. However, Stone's trial counsel could not have presented this evidence to the jury because they did not know about his brain damage. The question, therefore, is whether counsel should have known about it, or more specifically, whether trial counsel's investigation was reasonable under the Sixth Amendment even though trial counsel did not discover Stone's brain damage.

We first address the suggestion that trial counsel must always undertake a medical investigation for organic brain damage in any capital case. In other words, must trial counsel—as a part of every death penalty defense—obtain neuropsychological testing and neuroimaging such as MRI and PET scans, which are the objective tests from which Doctors Gur, Bookstein, and Merikangas were able to reach a definitive diagnosis in Stone of organic brain damage. The answer is clearly "no." We are unaware of any court that has adopted such a standard, and not even Stone's own presentation of evidence supports such a suggestion. The American Bar Association's *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, on which Stone consistently relies in this appeal,

do not require neuropsychological testing and neuroimaging in every case. Guideline 10.7—which governs counsel's investigation of the case—simply requires counsel to investigate all reasonable mitigation evidence. *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* 10.7 (rev. 2003).[6]  Moreover, appointed counsel—as trial counsel was here—is not permitted to obtain any testing that requires funding until counsel demonstrates to the trial court that such testing is reasonably necessary under the specific facts of the case.  Subsection 17-3-50(B) of the South Carolina Code (2014) provides counsel may obtain up to five hundred dollars to pursue "investigative, expert, or other services . . . reasonably necessary for the representation of the defendant." Under subsection 17-3-50(C), however, counsel may obtain more than five hundred dollars "only if the court certifies, in a written order with specific findings of fact, that . . . payment in excess of the limit is appropriate because the services provided were reasonably and necessarily incurred."

Therefore, counsel's performance cannot be found deficient simply because they did not seek neuropsychological testing or neuroimaging.  Rather, we measure counsel's performance by an objective standard of reasonableness.  *Weik*, 409 S.C. at 233, 761 S.E.2d 767 (quoting *Wiggins*, 539 U.S. at 521, 123 S. Ct. at 2535, 156 L. E. 2d at 484).  In *Wiggins*—a case involving the sufficiency of trial counsel's investigation of the defendant's background—the Supreme Court held there are no "specific guidelines for appropriate attorney conduct," but "the proper measure of attorney performance remains simply reasonableness under prevailing professional norms."  539 U.S. at 521, 123 S. Ct. at 2535, 156 L. Ed. 2d at 484.  In *Porter v. McCollum*, 558 U.S. 30, 130 S. Ct. 447, 175 L. Ed. 2d 398 (2009), the Supreme Court held that "under . . . prevailing professional norms . . . , counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'"  558 U.S. at 39, 130 S. Ct. at 452, 175 L. Ed. 2d at 405 (quoting *Williams v. Taylor*, 529 U.S. 362, 396, 120 S. Ct. 1495, 1515, 146 L. Ed. 2d 389, 420 (2000)); *see also Ard*, 372 S.C. at 331, 642 S.E.2d at 597 ("Without a doubt, 'a criminal defense attorney has a duty to investigate . . . .'").  As the Supreme Court did in *Wiggins*,

---

[6] The Supreme Court of the United States and this Court have relied on the ABA Guidelines to determine whether counsel's performance was reasonable under the first prong of *Strickland*.  *See e.g., Wiggins*, 539 U.S. at 524, 123 S. Ct. at 2536-37, 156 L. Ed. 2d at 486-87 (citing the ABA Guidelines, "to which we long have referred as 'guides to determining what is reasonable'"); *Ard*, 372 S.C. at 332, 642 S.E.2d at 597 (stating the ABA "has specifically provided guidelines for defense counsel's performance regarding investigation of a capital case," and then citing the ABA Guidelines in holding counsel's performance was unreasonable).

> [W]e focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [Stone's] background *was itself reasonable*. In assessing counsel's investigation, we must conduct an objective review of their performance, . . . which includes a context-dependent consideration of the challenged conduct as seen from "counsel's perspective at the time."

539 U.S. at 523, 123 S. Ct. at 2536, 156 L. Ed. 2d at 485-86 (citations omitted). In doing so, "every effort [must] be made to eliminate the distorting effects of hindsight," 539 U.S. at 523, 123 S. Ct. at 2536, 156 L. Ed. 2d at 486 (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065, 80 L.E.2d at 694), and we must recognize "a strong presumption that counsel rendered adequate assistance," *Ard*, 372 S.C. at 331, 642 S.E.2d at 596 (citing *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066, 80 L. E. 2d at 695).

Stone argues trial counsel was aware of numerous "red flag" indicators of Stone's brain damage during the investigation leading up to the resentencing proceeding. From these indicators, Stone argues, trial counsel should have seen the "need for further investigation" and to "seek basic neurological testing," "obtain neuroimaging," or "consult with experts." Stone contends these indicators were located in four sources: Stone's medical records, Stone's school records, Stone's siblings' school records, and expert testimony in the case.

First, Stone's medical records are not included in the Appendix before us because they were not admitted into evidence at the PCR trial. It is, therefore, impossible for this Court to find indicators in Stone's medical records that trial counsel should have further investigated Stone's brain damage. From testimony that describes the contents of Stone's medical records, we find little evidence the medical records contain any indication Stone suffered from brain damage. There is evidence the records contained one emergency report involving a head injury, but there was no indication the incident created a potential for brain damage or had any impact on Stone's neuropsychological health.

Stone's brief to this Court demonstrates the weakness of his argument. The brief states,

> [T]rial counsel possessed medical records for Bobby
> Stone, which showed that he was treated at the
> emergency room on numerous occasions. For example,
> when he was thirteen years old, Stone was treated at the
> hospital because he fell and injured his ribcage. At age
> fourteen, he experienced another fall during which he cut
> his right foot. The following year, he appeared in the ER
> complaining of pains in his left chest and broken ribs.
> Stone fell again at age sixteen, resulting in a fractured
> foot. Later that same year, Stone "fell about eight feet
> and ha[d] pain in his chest and back." At age twenty-
> seven, Stone was in a motor vehicle accident resulting in
> back pain. The following year, he was working on a car
> when the motor fell about a foot onto his head. Stone
> reported that a bolt went into his right ear. Emergency
> room staff noted abrasions, blood coming from the ear
> canal, cranial swelling and tenderness.

The brief contains no other argument as to how the medical records indicate potential brain damage. The one reference to a head injury—with little evidence as to its severity—is not a sufficient indicator of potential brain damage on the facts of this case to require a finding that trial counsel was deficient in not pursuing further testing. Moreover, Stone's experts at the PCR trial unanimously agreed his brain damage was "congenital," meaning it was present from birth. Thus, there is no chance Stone's brain damage was caused by this incident that occurred when he was twenty-eight years old.

From what the Appendix indicates about his medical history, Stone had remarkably little experience with head injuries. Therefore, we find no evidence that the medical records should have alerted trial counsel that Stone might have organic brain damage.

As to the second and third sources, PCR counsel argues Stone's school records and those of his siblings "contained numerous references to academic failure, impaired intellectual functioning and potential brain damage." These references include (1) Stone failed the first, fourth, and sixth grades; (2) he dropped out of school at age 17 after completing only the ninth grade; (3) his IQ scores declined from 86 in 1975 when Stone was ten years old to a range of 69 to 75 in 1979 when he was fourteen; (4) his reading, spelling, and math scores in the seventh grade placed him

in the first to fourth percentile among his peers; and (5) his original classification of "learning disabled" was downgraded to "educable mentally handicapped."[7] Stone's siblings' school records likewise indicated academic and intellectual deficits.

During the course of representing Stone, trial counsel employed several experts and other consultants, including a licensed clinical social worker, a psychologist, and a forensic psychiatrist. None of these professionals advised trial counsel to investigate brain damage. Stone has shown no specific basis for his argument that trial counsel should have realized further testing was warranted.

Trial counsel is not required to be omniscient. Rather, we evaluate counsel's performance in the realistic context of representing a capital defendant. As the Supreme Court stated in *Wiggins*, "we must conduct an objective review of their performance, . . . which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" 539 U.S. at 523, 123 S. Ct. at 2536, 156 L. Ed. 2d at 486. The PCR court found Stone "fail[ed] in meeting [his] burden with regard to showing counsel's investigation was not reasonable." We find ample evidence to support the PCR court's ruling. *See Ard*, 372 S.C. at 331, 642 S.E.2d at 596 ("This Court will uphold factual findings of the PCR court if there is any evidence of probative value to support them."). Stone has not persuaded us trial counsel's performance was unreasonable.

Stone's fourth argument—that trial counsel should have known from the testimony of their expert to investigate brain damage—is also not persuasive. Trial counsel retained a licensed clinical social worker—TeAnne Oehler—to investigate Stone's background and make a psychological or psycho-social evaluation. Oehler reviewed Stone's medical and school records; conducted numerous interviews with Stone, his family members, and others; and thoroughly investigated Stone's social, family, and personal history. The fact that Oehler never recommended neuropsychological testing or neuroimaging supports—not undermines—the reasonableness of counsel's decision not to pursue the testing.

---

[7] Educable mentally handicapped is a classification of mentally handicapped individuals for special education purposes. The educable mentally handicapped are "pupils of legal school age whose intellectual limitations require special classes or specialized education instruction to make them economically useful and socially adjusted." S.C. Code Ann. § 59-21-510 (2004).

Stone also argues "trial counsel failed to present even the mitigating evidence that they did have in their possession." We rely on Stone's brief to this Court to identify which items of mitigating evidence Stone now contends should have been presented, but were not. Stone makes two primary arguments. First, he argues Stone "consistently struggled with academic failure, very low psychological functioning, problems with visual-motor coordination, and deficits in adaptive functioning skills, among other things." He then states, "Oehler incorrectly testified at trial that Stone 'didn't have too much difficulty in school until about the sixth grade,' and that his academic record included no suggestion of possible mental retardation." Second, Stone argues trial counsel "failed to adequately prepare Oehler's testimony, preventing the jury from hearing an accurate account of Stone's academic difficulties and intellectual impairments."

We have examined in detail the mitigating evidence trial counsel did present during the resentencing proceeding, and we have compared it with mitigating evidence Stone's PCR counsel presented in the PCR trial. We find the evidence does not support Stone's arguments. Oehler presented the jury a bleak picture of Stone's life—including many of the same difficulties, struggles, and academic failures that Stone argues trial counsel failed to present. Oehler's extensive testimony on these subjects includes the following,

> There was a significant history of depression among family members. One aunt had a history of schizophrenia. . . . And there is a history of depression among other family members. His sisters, one sister in particular, has a history of depression and has been outpatient, as well as inpatient psychiatric care off and on through the years. . . . [His psychiatric history] describes a family life where it was one crisis after another, and a home life that was not emotionally secure . . . because of a history of depression that was severe. Family members weren't able to carry out their roles in the family because they were frequently disrupted by . . . the psychiatric hospitalizations.

Oehler described how this difficult family structure led to problems with school and employment,

> There's not just one family member who had difficulty in terms of judicial involvement or in terms of a history of depression or exposure to violence or problems in school, but it showed that for several generations on either side of the family, there's a significant history of alcoholism, of drug use, of problems with school, problems with employment. In this family, there's frequent changing of jobs, if people are employed. There's just not, very few family members have significant stable employment . . . .

Oehler further described "inadequate supervision during the day" and "nights where the children [did not have] a good sleep" such that "Stone, as a young child, frequently fell asleep in school and was unable to concentrate." She described "very poor life skills" and "poor structure" for Stone as a result of there not being "values in this family" that "you need to get an education," "you need to get a job," "you need to obey the law."

Particularly as to school, Oehler described "a history of learning disability," and stated "he didn't have the ability, according to these school records, to pay attention, to concentrate, to focus on information and to be able to internalize that to move forward with a plan." She testified all of this "absolutely" affected his judgment and his decision-making.

Oehler's presentation of Stone's social, family, and personal history was not perfect. PCR counsel argues in their brief she made two statements that might not have been accurate. First, Oehler stated Stone "didn't have too much difficulty in school until about the sixth grade," when in fact he did have difficulties. However, we read Oehler's statement of "not too much difficulty" as an effort to contrast those early years from the more significant difficulties he had in school after the sixth grade, and we find the contrast was effective. PCR counsel's second claim— that Oehler "incorrectly testified . . . that his academic record included no suggestion of mental retardation"—is itself a misstatement. Oehler's actual testimony—on cross examination by the solicitor over the objection of trial counsel—was "there's no *documentation* of mental retardation." In any event, PCR counsel does not argue Stone is mentally retarded. Stone also argues Oehler failed to give the jury Stone's numerical IQ scores. However, her overall presentation of Stone's "learning disability," her frequent references to his "problems with school," and her detailed descriptions of his poor "school performance" gave the jury a

reasonably clear picture of the effects of Stone's low IQ, even if the jury didn't know the scores themselves.

As to Stone's claim that trial counsel failed to properly investigate and present evidence of his brain damage and present evidence of his low intellectual functioning, we find the PCR court's ruling that trial counsel's performance did not fall below an objective standard of reasonableness is supported by the evidence.

## V.     Accident Theory of the Case

Part of trial counsel's strategy was to present the theory that Stone did not intend to shoot and kill Sergeant Kubala. PCR counsel stated in their brief:

> It is important at the outset to note that Stone does not take issue with trial counsel's basic strategy. It was a plausible defense (in fact it was the only plausible defense), it was advocated by their client, and it was consistent with the evidence and Stone's statements to law enforcement.

However, Stone argues trial counsel failed to properly implement the strategy because they did not thoroughly investigate and present evidence supporting the accidental shooting theory. We disagree.

### A.     During the Guilt or Innocence Phase

As part of their investigation, trial counsel retained Don Girndt, a former agent of the South Carolina Law Enforcement Division (SLED) with expertise in firearms. Girndt examined the murder weapon and visited the crime scene. Girndt informed trial counsel it was impossible to determine whether the shooting was accidental or intentional. Rather than put Girndt on the stand to testify, trial counsel chose to elicit facts that supported the accident theory through cross examination. Girndt assisted trial counsel by sitting with trial counsel during the State's presentation of evidence and offering advice on how to effectively cross examine the State's witnesses, including firearms expert Ira Parnell—also a former SLED agent. During cross examination, Parnell admitted "the trigger pull on [Stone's pistol] was very light." Trial counsel also asked Parnell, "One final thing. [Stone's pistol] being a target gun set up with very light trigger pull, the play in the trigger was

very slight as opposed to a gun with a heavy pull; isn't that right?"  Parnell responded, "That's true."

Trial counsel also elicited facts supporting the accident theory on cross examination of other witnesses.  Deputy John Prince testified he arrived at the scene "within probably two minutes at the most" and "the left side of the house where Sergeant Kubala was found [was] completely dark."  Ray MacKessy, the State's crime scene technician, testified the porch wall was boarded up in a way that made it difficult for Stone to see someone approaching the porch.

The only facts PCR counsel argues trial counsel should have presented regarding the accident theory—but did not present—related to the trajectory of the bullets.  As PCR counsel argues, this evidence indicates Stone "shot from waist level."  However, the fact Stone shot from the waist does not support the theory he shot accidentally.  At the PCR trial, PCR counsel presented the testimony of Wayne Hill—an expert in homicide reconstruction.  Hill testified the trajectory of the bullets upward from Stone's waist striking Sergeant Kubala in the neck and ear "are more consistent with somebody who is doing what's called cowboy action shooting, whereas you would know from the Western shooting from the hip."  We find it difficult to imagine *three* accidental shots fired from the hip upward to the height of another man's head.  Trial counsel was wise not to present this evidence.

During closing, trial counsel used these facts—not including that Stone shot from the hip—to argue the accident theory of the case.  Specifically, trial counsel argued the State failed to meet its burden as to the malice element of murder because Sergeant Kubala simply surprised Stone, who—in his drunken state—turned and accidentally shot Kubala.  Trial counsel stated, "The little porch is boarded up to an elevation that was . . . taller than Sergeant Kubala. . . .  If Sergeant Kubala is walking right next to the house, how is Bobby Stone going to see him?  How was Bobby Stone going to hear him if Bobby Stone is knocking on the door?"  Trial counsel continued, "He's in the dark and suddenly he is startled by a voice.  And he turns and as he told you in his statement, the hair trigger done again went off.  Apparently three shots."

We find trial counsel's approach to the accident theory in general, and hiring of Girndt in particular, was reasonable.  First, trial counsel's investigation of the accident theory is consistent with the ABA Guidelines.  Guideline 11.4.1—which relates to counsel's investigation of the case—states,

> Counsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial. Both investigations should begin immediately upon counsel's entry into the case and should be pursued expeditiously.

*ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* 11.4.1.A (1989).[8]

Regarding the use of expert witnesses, section 7 of Guideline 11.4.1 provides,

> Counsel should secure the assistance of experts where it is necessary or appropriate for: (A) preparation of the defense; (B) adequate understanding of the prosecution's case; (C) rebuttal of any portion of the prosecution's case at the guilt/innocence phase or the sentencing phase of the trial; (D) presentation of mitigation.

*ABA Guidelines* 11.4.1.7.

Trial counsel's investigation of the accident theory began with hiring Girndt, an expert. Girndt provided valuable assistance to trial counsel by examining the evidence, informing trial counsel of his opinion, and advising trial counsel how to effectively cross examine the State's witnesses. The PCR court found trial counsel was not deficient in their investigation. We find ample evidence to support this finding.

Stone does not argue trial counsel should have called Girndt to testify. In light of Girndt's opinion that he could not say the shooting was accidental, trial counsel's decision not to present his testimony to the jury was clearly reasonable. Stone argues, however, trial counsel should have found another expert—one who would testify the shooting was an accident. The PCR court found trial counsel was reasonable in making the decision not to pursue another expert. The evidence supports this finding, and we agree. The "prevailing norms" that guide our judgment as to whether counsel's performance was reasonable do not require counsel to pursue a second expert after a qualified expert has given an adverse opinion. *See Poyner v. Murray*, 964 F.2d 1404, 1419 (4th Cir. 1992) ("The mere

---

[8] During Stone's 1997 trial, the applicable version the ABA Guidelines was the 1989 version.

fact counsel did not shop around for a psychiatrist willing to testify to the presence of more elaborate or grave psychological disorders simply does not constitute ineffective assistance."); *Pruett v. Thompson*, 996 F.2d 1560, 1574 (4th Cir. 1993) (holding counsel was not ineffective for failing to further investigate a theory after counsel had good cause to believe the theory was incredible).  After trial counsel learned Girndt was unable to give an opinion that supported the accident theory, trial counsel's decision not to seek an expert with a different opinion was reasonable.

Moreover, Stone did not demonstrate the availability of such a witness.  PCR counsel presented Hill and Dr. Merikangas at the PCR trial to support the accident theory.  Hill's only testimony favorable to the accident theory was that there was no physical evidence contradicting Stone's version of what happened.  We find Hill's opinion to be no more favorable to Stone than Girndt's opinion.  In fact, Hill's opinion did not withstand cross examination at the PCR trial.  First, Hill admitted the facts and circumstances do not exclude the possibility that Stone intentionally aimed and fired the gun.  Second, Hill admitted it would take three separate trigger pulls to fire the semi-automatic pistol three times.  Trial counsel would prefer not to see these key admissions from his own expert.  We likewise find Dr. Merikangas—a neurologist and psychiatrist—to be unconvincing on the accident theory.  The weakness of Hill and Merikangas's testimony underscores the reasonableness of trial counsel's decision not to use Girndt or an expert similar to Hill at trial.

We find Stone did not prove trial counsel's performance fell below an objective standard of reasonableness in investigating or presenting evidence to support the accident theory of the case.

### B.     During the Resentencing Proceeding

Stone also argues trial counsel failed to properly support the accident theory in the 2005 resentencing proceeding.  The PCR court found trial counsel's performance in this respect was reasonable.  The evidence supports the finding.  At the time of the resentencing proceeding, Girndt was still unable to testify the shooting was accidental.  Trial counsel once again decided to use cross examination to establish the few facts that supported the accident theory, and he once again argued those facts in closing.  We find trial counsel fulfilled his obligation to thoroughly investigate and present evidence of the accident theory of the case.

## VI. Conclusion

We find trial and appellate counsel's performance was reasonable in almost every respect. In several respects, as we have explained, counsel's performance did not meet an objective standard of reasonableness, and thus was deficient under the first prong of *Strickland*. As to each of these failures, however, Stone did not prove a reasonable probability the outcome would have been different as required by the second prong. As to each claim that his counsel was ineffective under the Sixth Amendment, therefore, Stone did not meet his burden under *Strickland*. The PCR court's denial of post-conviction relief is **AFFIRMED.**

**BEATTY, C.J. and KITTREDGE, J., concur. HEARN, J., concurring in result only. Acting Justice Costa M. Pleicones, dissenting in a separate opinion.**

**ACTING JUSTICE PLEICONES:** I respectfully dissent.

I agree with the majority that appellate counsel was deficient in failing to properly appeal meritorious objections made at petitioner's resentencing hearing regarding Sergeant Kubala's wife's suicide testimony. However, in my opinion, appellate counsel's error prejudiced petitioner. I would find the widow's suicide statement inadmissible under the United States Supreme Court's test for constitutionally permissible penalty phase testimony. And in my opinion, had appellate counsel properly raised the issue on appeal, there is a reasonable probability this Court would have reversed petitioner's death sentence. Accordingly, as explained below, I would find the PCR judge erred in denying petitioner relief.

The traditional two-part *Strickland* analysis applies to claims of ineffective assistance of appellate counsel. *Southerland v. State*, 337 S.C. 610, 616, 524 S.E.2d 833, 836 (1999); *see also Strickland v. Washington*, 466 U.S. 668 (1984). However, "[i]n order to show that he was prejudiced by appellate counsel's performance, a PCR applicant must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Bennett v. State*, 383 S.C. 303, 309–10, 680 S.E.2d 273, 276 (2009) (citing Cherry v. State, 300 S.C. 115, 117–18, 386 S.E.2d 624, 625 (1989).

The seminal case allowing a state to introduce victim impact statements at a sentencing proceeding is *Payne v. Tennessee*. *See* 501 U.S. 808 (1991). This allowance, however, is not unfettered, as *Payne* also establishes that in order to be admissible, victim impact statements must be relevant to the crime in question by

showing "the specific harm *caused by the defendant*."  *Id.* at 825–27 (emphasis supplied).  Further, where victim impact evidence is so unduly prejudicial that it renders the sentencing proceeding fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief.  *Id.* at 25 (citing *Darden v. Wainwright*, 477 U.S. 168, 179–183 (1986).

Resentencing counsel based his objection to the widow's statements on the grounds that according to her own testimony, the suicide attempt was due to her reaction to this Court's ruling, not Sergeant Kubala's death seven years prior.  Thus, resentencing counsel argued, "the causation factor" was too remote, and her statements were "highly prejudicial."

In overruling counsel's objection to the testimony, the resentencing judge ruled the statement was "partially related" to the shooting of Sergeant Kubala. I disagree, and find that to the contrary, nothing in the widow's testimony related her suicide attempt to the specific harm caused by petitioner.

Notably, the widow never mentioned Sergeant Kubala or his death during her detailed testimony regarding her suicide attempt. Instead, the widow's testimony established her suicide attempt—seven years after Sergeant Kubala's death—was the result of her emotional turmoil caused by this Court's decision to reverse petitioner's original death sentence, which occurred at a time she was experiencing financial and familial difficulties. In my view, the testimony was simply unrelated to the death of Sergeant Kubala; therefore, it was irrelevant and inadmissible, and had appellate counsel properly appealed the relevancy objection made at resentencing, there is a reasonable probability that this Court would have reversed petitioner's death sentence. *See Payne*, 501 U.S. at 825, 827; *Bennett v. State*, 383 S.C. at 309–10, 680 S.E.2d at 276 (citation omitted); *see also Coleman v. State*, 558 N.E.2d 1059, 1062 (Ind. 1990) (holding a victim's mother's statement that she attempted suicide after the crime was "irrelevant" and "highly prejudicial," but was not a violation of the Eighth Amendment to the United States Constitution *because the statement was not made in front of the sentencing jury*).

Further, as to resentencing counsel's argument that the widow's suicide statement was "highly prejudicial," it is my opinion that pursuant to S.C. Code Ann. § 16-3-25(C)(1) (2003), the Court would have also likely reversed petitioner's death sentence on this ground had it been properly presented on appeal. *See* § 16-3-25(C)(1) (stating in the case of a death sentence imposition, this Court "shall consider the punishment" and determine "whether the sentence of death was imposed under the influence of passion, prejudice, *or any other arbitrary factor*, . . ." (emphasis supplied)); *Coleman v. State*, 558 N.E.2d at 1062; *see also Payne*, 501 U.S. at 825 (finding a victim impact statement that is "unduly prejudicial" is a Due Process violation under the Fourteenth Amendment); *see also Evitts v. Lucey*, 469 U.S. 387, 396–97 (1985) (holding, to be effective, appellate counsel must give assistance of such quality as to make appellate proceedings fair).

The prejudicial impact of the widow's suicide testimony results, *inter alia*, by imparting to the jury: (1) pressure to resentence petitioner to death lest his widow endure additional unbearable suffering as a result of their decision; *see* § 16-3-25(C)(1); (2) raises the specter of appellate review into the deliberation; *see*

*Caldwell v. Mississippi*, 472 U.S. 320, 328–29 (1985) ("[I]t is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere"); *see also, e.g.*, *State v. Tyner*, 273 S.C. 646, 659, 258 S.E.2d 559, 566 (1979) (holding remarks by a prosecutor about appellate safeguards may require reversal where it suggests to the jury that it may pass the responsibility for a death sentence on to a higher court); and (3) the notion that Sergeant Kubala's widow believed the death penalty was the appropriate sentence; *cf. State v. Wise*, 359 S.C. 14, 27, 596 S.E.2d 475, 481–82 (2004) ("a capital defendant may not present a penalty-phase witness to testify explicitly what verdict the jury 'ought' to reach" (citation omitted)); *State v. Adams*, 277 S.C. 115, 283 S.E.2d 582 (1981) (holding whether death penalty should be imposed is an ultimate issue reserved for jury's determination), *overruled on other grounds by State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315 (1991).

In summary, I agree with the majority that appellate counsel was deficient; however, in my opinion, petitioner was prejudiced by the deficiency because had appellate counsel argued the grounds raised by resentencing counsel, there is a reasonable probability this Court would have reversed petitioner's death sentence. Moreover, I note that the majority opinion appears to reflect a misunderstanding of this Court's role in reviewing a PCR judge's order on certiorari. Specifically, I find the majority's decision to omit almost entirely from its opinion discussion of the PCR judge's rulings, in lieu of discussing at length petitioner's arguments, fails to provide sufficient context or analysis to support the majority's dispositions on the issues before it.

I would reverse the PCR judge's order and require petitioner receive a new resentencing hearing.