# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Mack Washington, Jr., Petitioner,

v.

State of South Carolina, Respondent.

Appellate Case No. 2018-000182

---

## ON WRIT OF CERTIORARI

---

Appeal From Colleton County
Perry M. Buckner, III, Trial Court Judge
Thomas A. Russo, Post-Conviction Relief Judge

---

Opinion No. 5997
Heard October 12, 2022 – Filed July 5, 2023

---

## REVERSED

---

Appellate Defender Jessica M. Saxon and Taylor Davis
Gilliam, both of Columbia, for Petitioner.

Senior Assistant Deputy Attorney General William M.
Blitch, Jr. and Assistant Attorney General Joshua
Abraham Edwards, both of Columbia, for Respondent.

---

**KONDUROS, J.:** In this post-conviction relief (PCR) action, Mack Washington,
Jr. (Petitioner) appeals the denial of his PCR application. He contends the PCR
court erred in finding trial counsel was not ineffective for failing to preserve the

issue of an improper closing argument for direct appeal when the solicitor referred to "a pattern" of conduct and asked the jury "[w]ho among us is safe[?]"  We reverse.

## FACTS/PROCEDURAL HISTORY

Frank Klem and Joan Klem[1] (collectively, the Klems) checked into the Rice Planters Inn in Walterboro on January 7, 2012, around 11:00 p.m.  Two males followed them into their room and one of the men grabbed Joan around her waist and held a knife on her.  The other perpetrator instructed Frank and Joan to give them their wallet, purse, and car keys or they would kill Joan.  The Klems put their possessions on the bed, and the perpetrators took Frank's wallet, Joan's purse, and their car keys, and pulled the hotel phone out of the wall.  The perpetrators fled in the Klems' white Chevrolet Impala, which contained luggage, golf clubs, and two rifles.

In connection with this incident, a Colleton County grand jury indicted Petitioner for possession of a weapon during the commission of a violent crime, two counts of kidnapping, and two counts of armed robbery.

Trial began March 17, 2014.  At trial, Tyneshia Young testified Petitioner visited her apartment in Druid Hills "[a]lmost every other day" but he did not live there.  Young testified she saw Petitioner on January 7, 2012, at her apartment.  She later saw Petitioner with Tyheem Lewis[2] in the early morning hours of January 8.  She provided she observed Lewis sitting on the couch in her living room at that time and noticed something large on the couch next to him.  Young stated "[i]t almost looked like a guitar on the couch."  Young testified Lewis indicated the item belonged to Petitioner.

Young testified Petitioner returned to her apartment in the evening on January 8, and later, they heard someone knock on the door.  Young provided she went to the door and saw police.  She stated Petitioner would not let her open the door; rather, he put her in her room and went to the bathroom.  Young testified Petitioner then put her in the bathroom and she called her mother.  She stated that when she returned to her room, she saw Petitioner take guns out of her closet and put them under her bed.  Young testified she called her mother again and talked to a police

---

[1] Frank testified he was eighty-five years old at the time of trial, and Joan testified she was eighty years old.
[2] Lewis was sixteen at the time of this incident.

officer. She stated she eventually opened the door once Petitioner allowed her to do so and she told police where they could locate the guns.

Young provided she initially told police someone else brought the guns to her house; however, she stated she lied because Petitioner told her to do so. Young testified she spoke to police again when she was arrested for receiving stolen goods and she lied to Lieutenant Jason Chapman of the Walterboro Police Department but eventually told him the truth. She stated police dismissed her charge but no one promised her anything for it to be dismissed. Additionally, Young testified a maintenance worker found credit cards and an older white woman's ID in her toilet and she believed Petitioner put the cards in her toilet.[3]

Lewis testified he pled guilty in exchange for a one- to six-year sentence and agreed to testify against Petitioner. He stated that on January 7, 2012, Petitioner asked if he wanted to make some money. Lewis testified he confirmed he wanted to make money and met with Petitioner later that night. He stated they went to the Rice Planters Inn and after waiting, saw a white male and white female pull into the parking lot and go inside their room. Lewis testified they ran in behind them and Petitioner grabbed the female and held a knife to her throat while Lewis grabbed a phone, wallet, purse, and car keys. He stated they then ran to the car and fled. Lewis testified they threw some items away near water and parked the car; however, they took the guns and went back to Druid Hills apartments. He stated Petitioner planned to pick up the car the following day and they were going to take it to a "chop shop."

Lewis testified he later spoke with police and confessed to the crime. Additionally, he confirmed he sent a letter to the solicitor, stating Petitioner was not with Lewis when he committed the crime, and another letter, stating the first letter was true.[4] However, Young testified the letters were not true but he sent them because

---

[3] A maintenance employee at Young's apartment stated he found several credit cards belonging to Frank and Joan and a driver's license in Young's toilet on January 16, 2012.

[4] Major Leslie Jamison, a jail administrator, testified Petitioner requested in October 2013 she "notarize a letter in reference to a witness or a victim saying he didn't do the crime," so he could send a copy to his attorney and the Solicitor's Office. However, Major Jamison provided she refused to notarize it. She testified she later spoke with Petitioner and he told her he needed her to notarize a letter written by witness or victim stating he did not commit the crime; she refused to notarize it. She testified Lewis never requested she notarize a letter.

Petitioner asked him to send them and he felt pressured to do so. He also stated he was pressured by police to help them prosecute Petitioner and police promised him leniency if he would help in Petitioner's prosecution. Lewis testified he believed the solicitor could have prosecuted him for kidnapping if he did not testify against Petitioner, which was part of the reason Lewis testified against Petitioner. However, Lewis maintained his statement to police implicating himself and Petitioner was true.

Lieutenant Chapman testified that on January 8, 2012, he received a phone call informing him the two firearms stolen during the robbery were in a particular apartment at Druid Hills. Lieutenant Chapman stated he reviewed the initial robbery report and confirmed two rifles had been stolen from the Klems. Lieutenant Chapman provided he confirmed with the informant the two firearms located in the Druid Hills apartment were "long guns[] or rifles," which matched the description of the firearms stolen from the Klems. Lieutenant Chapman testified he and a group of officers went to the apartment, which registered as being occupied by Young. He indicated no one would answer the door but he heard movement inside. He testified Young's mother approached them and he spoke to Young on the phone through her. Lieutenant Chapman testified Young eventually opened the door and gave him permission to obtain the guns from under her bed. He stated the police determined the guns were the ones stolen from the Klems.

Lieutenant Chapman provided police recovered the Klems' luggage and personal effects near a boat landing on January 10, 2012.[5] He testified that later in the month, police recovered Frank's golf clubs in Charleston. The following day, police learned of a possible location for the missing Impala and located what remained of the vehicle a few days later.

Lieutenant Chapman testified he spoke to Young again shortly after recovering the guns from her apartment and he believed she was not being honest. He stated he later arrested Young for receiving stolen goods and Young told him Petitioner and Lewis brought the guns to her apartment. Lieutenant Chapman testified he interviewed Lewis, arrested him, and issued warrants for Petitioner. He stated he recommended Young's charge be dropped after he spoke with Lewis.

---

[5] Sergeant Kirt Wallace with the Colleton County Sheriff's Office testified he went to a boat landing on January 8, 2012, and found luggage and a red binder, which contained a death certificate for Eric Klem, the Klems' son. Lieutenant Chapman testified Sergeant Wallace brought the red binder to the Walterboro Police Department when he learned it related to the department's investigation.

Quincy White, an acquaintance of Petitioner's, testified he saw Petitioner driving a gray Impala and later standing outside the Impala in January 2012.  He stated that when he walked by Petitioner, he did not really hear Petitioner say anything regarding the car.  However, upon further questioning, White testified he heard Petitioner say he stole the Impala.  White stated he later saw the Impala behind his abandoned house and the car was stripped while there.  White testified he was charged with possession of a stolen vehicle regarding this matter and he obtained a deal—the charges would be dropped—for his testimony.  He stated the deal did not have anything to do with his testimony; rather, he testified because he wanted the warrant against him dropped.

After trial counsel's closing argument, the solicitor gave her closing argument and stated the following at the end of the argument:

> [Petitioner] has . . . a pattern of manipulating young people and luring them and intimidating them.  He has a pattern of violence, throwing Tyneshia Young to the floor and intimidating and manipulating her into lying for him.  *He has a pattern of robbing old folks, intimidating old folks, kidnapping old folks, holding them up.*  And also, trying to manipulate Captain Jamison.
>
> I ask you, this day, who is safe from the force that is [Petitioner]?  Who among us is safe, ladies and gentlemen?  I told you I would ask you.  I ask you now, I beseech you now, to find [Petitioner] guilty of armed robbery of Frank and Joan Klem, of kidnapping of Frank and Joan Klem, of possession of a weapon during the commission of a violent crime, because then and then only, ladies and gentlemen, then and then only will [Petitioner] cease from trouble.  And the weary traveler can finally be at rest.

 (emphasis added).  The trial court took a brief recess.

Thereafter, trial counsel moved for a mistrial outside the presence of the jury.  He argued the solicitor's comments in closing arguments about Petitioner having a pattern of robbing old people was improper because it implied he had a prior record for the same charges when his record had not been published to the jury.

Trial counsel explained he believed the solicitor's comments implied Petitioner had a prior record of robbing old people because "[a] pattern is not just one time"; rather, it "is something that is repeated." He asserted the comments prejudiced Petitioner.

The solicitor argued her comments were not improper because Joan and Frank were older—eighty years old and eighty-five years old at the time of trial—and she did not believe her comments implied Petitioner had a prior record. She stated that the pattern was that Joan and Frank were together. Additionally, the solicitor contended a curative instruction would be the appropriate remedy if the trial court deemed the comments improper.

The trial court denied Petitioner's mistrial motion and stated the following:

> I do not believe that the Solicitor mentioned anything about [Petitioner] having a record in her argument to the jury. It is your contention that the use of the term "pattern" and of course, could be construed to [be] more than one victim in this case, and my verdict form has seven questions on it. That you could consider a pattern to be more than one incident. Here, we have an allegation of more than one armed robbery, more than one kidnapping, which has been vigorously defended. I do not believe that gives rise to a mistrial. On the other side of that fence, would you want the [c]ourt to prevent any confusion, which I don't think exists, but would you want a curative instruction from the [c]ourt where I instruct them to disregard the use of the term "pattern" from an argument by an attorney?

Trial counsel declined the offer, stating he "wouldn't really want to call attention to it." The jury convicted Petitioner as indicted, and the trial court imposed an aggregate sentence of thirty-five years' imprisonment.[6] The trial court also revoked Petitioner's probation in full. Petitioner filed a direct appeal, which this court dismissed pursuant to *Anders v. California*, 386 U.S. 738 (1967). *See State v. Washington*, Op. No. 2016-UP-101 (S.C. Ct. App. filed Mar. 2, 2016).

---

[6] The sentence was thirty years' imprisonment for each of the kidnapping and armed robbery charges to run concurrently, along with five years' imprisonment for the weapons charge to run consecutively.

Petitioner filed a PCR application, alleging trial counsel was ineffective for refusing the curative instruction.  At the PCR hearing, Petitioner testified he was concerned about the solicitor's closing argument, specifically when the solicitor told the jury he had a pattern of conduct and when the solicitor asked the jury: "Who among us is safe[?]"  He believed the solicitor "put [his] character in play when she said [he] had a pattern."  He explained he believed a pattern indicated past behavior, meaning he had a record of committing the actions the solicitor named.  Petitioner maintained his criminal record had not been presented to the jury because he did not testify at trial.  Petitioner testified there was no pattern in this case because although there were two victims, they were involved in the same incident.

Trial counsel testified he moved for a mistrial based on the solicitor's closing argument and believed he had a "slam dunk" mistrial motion based on her discussion of a pattern because Petitioner did not testify at trial.  He stated he believed the solicitor's statement about a "pattern of robbing old people" was the "most prejudicial" statement.  He acknowledged the solicitor alleged Petitioner used force to coerce people during four incidents in this case.  Trial counsel believed the mistrial motion should have been granted and the denial of the motion "would have been a good ground[]" for appeal.  When asked about error preservation and whether an attorney needed to object contemporaneously before the end of closing argument, trial counsel stated he knew an attorney could object during closing argument but noted he was not an appellate attorney and had never handled an appeal.  He testified he declined the trial court's offer to give a curative instruction because he did not want to call further attention to the comments.  Trial counsel referred to his decision as "a trial strategy decision."  Trial counsel stated he would have asked for a curative instruction had he objected during closing argument because he would have already drawn attention to the statement.  He explained he moved for a mistrial because he did not believe the jury would actually disregard the improper comments based on a curative instruction.  Additionally, trial counsel testified the solicitor "skirted the edge a little bit" when she asked the jury "[w]ho among us is safe[?]"  He stated he considered this question and it was part of the basis for his mistrial motion even though he did not specifically mention it to the trial court.  Trial counsel explained "sometimes you have to make a call about objecting while somebody is in closing argument" because if an attorney objects and is wrong, the trial court would "castigate[] and fuss[] at" them.  Trial counsel believed he "had a pretty meritorious actual ground for a motion for a mistrial."

The prosecuting solicitor testified the pattern she referenced in the closing argument related to Petitioner's conduct in the present case, not his prior behavior. She explained she was referring to Petitioner manipulating Lewis into participating in the robbery, intimidating Lewis into writing an exculpatory letter on his behalf, refusing to allow Young to open the door for police, threatening and manipulating Young, and robbing and kidnapping the Klems. She stated the Klems were older and Petitioner committed two kidnappings and two robberies.

The PCR court concluded trial counsel was not ineffective. It found trial counsel's testimony to be credible while finding Petitioner's testimony was not credible. The PCR court found trial counsel failed to preserve the closing argument issue for direct appeal when he refused the curative instruction; however, it concluded trial counsel was not deficient in refusing the curative instruction because he articulated a valid strategy in doing so—he did not want to draw the jury's attention to the comments. It noted trial counsel "believed he had a valid argument for a mistrial, which could have been granted at the conclusion of the closing argument outside of the jury's presence." The PCR court further found Petitioner failed to show a direct appeal would have been successful if the issue were preserved because "the solicitor's use of the word 'pattern' appropriately described [his] consistent *modus operandi* of intimidation and manipulation" and it did not imply or reference Petitioner's criminal history. The PCR court concluded Petitioner failed to show "prejudice[] because the jury had no reason to believe he had a prior criminal history from the solicitor's comments."

The petitioner filed a petition for a writ of certiorari, which this court granted.

**STANDARD OF REVIEW**

"In post-conviction proceedings, the burden of proof is on the applicant to prove the allegations in his application." *Speaks v. State*, 377 S.C. 396, 399, 660 S.E.2d 512, 514 (2008). "Our standard of review in PCR cases depends on the specific issue before us." *Mangal v. State*, 421 S.C. 85, 91, 805 S.E.2d 568, 571 (2017). "We defer to a PCR court's findings of fact and will uphold them if there is any evidence in the record to support them." *Id.*; *see also Sellner v. State*, 416 S.C. 606, 610, 787 S.E.2d 525, 527 (2016) (holding an appellate "[c]ourt gives great deference to the factual findings of the PCR court and will uphold them if there is any evidence of probative value to support them"). However, "[w]e do not defer to a PCR court's rulings on questions of law." *Mangal*, 421 S.C. at 91, 805 S.E.2d at 571. "Questions of law are reviewed de novo, and we will reverse the PCR court's decision when it is controlled by an error of law." *Id.* (quoting *Sellner*, 416 S.C. at

610, 787 S.E.2d at 527).  "This court gives great deference to the PCR court's findings on matters of credibility."  *Putnam v. State*, 417 S.C. 252, 260, 789 S.E.2d 594, 598 (Ct. App. 2016).

## LAW/ANALYSIS

Petitioner argues the PCR court erred in finding trial counsel was not ineffective for failing to preserve the improper closing argument issue for direct appeal when he failed to (1) contemporaneously object when the solicitor told the jury Petitioner had a pattern of conduct, including a pattern of robbing old people, a pattern of manipulating young people, and a pattern of violence; (2) object to the entirety of the improper argument, including when the solicitor asked the jury "[w]ho among us is safe[?]"; and (3) accept a curative instruction.  Petitioner contends the solicitor's statements during closing arguments "intimated and frightened the jury into a guilty verdict" and the solicitor "capitalized not only on the jury's fear of robbery, but also on the unknown prior history of a criminal defendant who had not taken the stand."  Petitioner argues he was prejudiced because the State's evidence did not amount to overwhelming evidence of guilt.  We agree.

### I.  Ineffective Assistance of Counsel

"A criminal defendant is guaranteed the right to effective assistance of counsel under the Sixth Amendment to the United States Constitution."  *Taylor v. State*, 404 S.C. 350, 359, 745 S.E.2d 97, 101 (2013).  To establish a claim for ineffective assistance of counsel, a PCR applicant must show (1) counsel's performance was deficient because it "fell below an objective standard of reasonableness" and (2) "there is a reasonable probability that, but for counsel's . . . errors, the result of the proceeding would have been different."  *Strickland v. Washington*, 466 U.S. 668, 687-89, 694 (1984).  "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim."  *Id.* at 700.

"[A]n issue that was raised on direct appeal but found to be unpreserved may be raised in the context of a PCR claim alleging ineffective assistance of counsel."  *McHam v. State*, 404 S.C. 465, 475, 746 S.E.2d 41, 47 (2013), *abrogated on other grounds by Smalls v. State*, 422 S.C. 174, 181 n.2, 810 S.E.2d 836, 839 n.2 (2018).  In *McHam*, the direct appeal had been filed pursuant to *Anders*, and the court of appeals dismissed the appeal.  *Id.* at 471, 746 S.E.2d at 45.  On review from the denial of the petitioner's PCR application, the supreme court determined "the [c]ourt of [a]ppeals did not consider the merits of the . . . issue because it was not preserved by trial counsel."  *Id.* at 469, 475, 746 S.E.2d at 43, 47.  Accordingly, the

supreme court found "an examination of the merits of the issue is appropriate in analyzing the prejudice prong in [the] PCR claim." *Id.* at 475, 746 S.E.2d at 47.

## II. Closing Argument

A closing argument must stay contained to the evidence within the record or any reasonable inferences that can be drawn therefrom. *Vasquez v. State*, 388 S.C. 447, 458, 698 S.E.2d 561, 566 (2010). "A solicitor's closing argument must not appeal to the personal biases of the jurors nor be calculated to arouse the jurors' passions or prejudices, and its content should stay within the record and reasonable inferences to it." *Humphries v. State*, 351 S.C. 362, 373, 570 S.E.2d 160, 166 (2002). A solicitor is allowed to argue his or her version of the evidence and to comment on how much weight to give such evidence. *Vasquez*, 388 S.C. at 458, 698 S.E.2d at 566. However, a solicitor's duty is to see justice done, not to convict a defendant. *Id.* Therefore, a closing argument "must be carefully tailored so as not to appeal to the personal bias of the juror nor be calculated to arouse his passion or prejudice." *Id.* (quoting *State v. Northcutt*, 372 S.C. 207, 222, 641 S.E.2d 873, 881 (2007)). "Jurors are sworn to be governed by the evidence, and it is their duty to consider the facts of the case impartially." *State v. Reese*, 370 S.C. 31, 38, 633 S.E.2d 898, 901 (2006), *overruled on other grounds by State v. Belcher*, 385 S.C. 597, 685 S.E.2d 802 (2009).

When counsel makes an improper argument, opposing counsel should "*immediately* object and . . . have a record made of the statements or language complained of and . . . ask the court for a distinct ruling thereon." *State v. Black*, 319 S.C. 515, 521, 462 S.E.2d 311, 315 (Ct. App. 1995). "The trial court has broad discretion when dealing with the propriety of the solicitor's argument, including the question of whether to grant a defendant's mistrial motion." *State v. Copeland*, 321 S.C. 318, 324, 468 S.E.2d 620, 624 (1996). "Improper comments do not require reversal if they are not prejudicial to the defendant, and the appellant has the burden of proving he did not receive a fair trial because of the alleged improper argument." *Randall v. State*, 356 S.C. 639, 642, 591 S.E.2d 608, 610 (2004). Accordingly, the appellate court must determine whether the improper argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* To make this determination, the appellate court will review the improper argument in the context of the entire record. *Simmons v. State*, 331 S.C. 333, 338, 503 S.E.2d 164, 166 (1998).

"The decision to grant or deny a mistrial is within the sound discretion of the trial court." *State v. Harris*, 382 S.C. 107, 117, 674 S.E.2d 532, 537 (Ct. App. 2009).

"The power of the trial court to declare a mistrial should be used with the greatest caution" and only "when absolutely necessary" and a defendant has to "show both error and resulting prejudice." *Id.* "The granting of a motion for a mistrial is an extreme measure that should only be taken if an incident is so grievous that the prejudicial effect can be removed in no other way." *Id.*

In *State v. Wiley*, this court concluded the solicitor's opening statement, which mentioned the defendant had an unrelated warrant for his arrest, "was not sufficiently prejudicial to warrant a mistrial" because it was "a vague reference to his prior criminal record" and even if the jury inferred the defendant committed another crime, the State never attempted to prove the defendant was convicted of another crime. 387 S.C. 490, 495-96, 692 S.E.2d 560, 563 (Ct. App. 2010). However, in *State v. Huggins*, at the defendant and her paramour's trial for the murder of the defendant's husband, the solicitor stated during closing arguments the defendant had a plan and offered to pay someone to kill the victim. 325 S.C. 103, 105-07, 481 S.E.2d 114, 115-16 (1997). The supreme court found because no evidence was presented the defendant had done so, the solicitor's statement was fundamentally unfair and highly prejudicial, especially when there was not overwhelming evidence of the defendant's guilt. *Id.* at 107-08, 481 S.E.2d at 116. Accordingly, the supreme court determined the trial court erred in denying the mistrial motion. *Id.* at 108, 481 S.E.2d at 116-17.

"[D]efendants are protected from overly prejudicial evidence by due process." *Humphries*, 351 S.C. at 375, 570 S.E.2d at 167. "In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Id.* (quoting *Payne v. Tennessee*, 501 U.S. 808, 825 (1991)). In *Humphries*, a death penalty PCR in which the petitioner argued the solicitor had improperly compared his life to the victim, the supreme court "consider[ed] whether any of the solicitor's comments in his closing argument were so unduly prejudicial as to render his sentencing fundamentally unfair." *Id.* at 371-76, 570 S.E.2d at 165-67. The court noted "[i]nstead of arguing prejudice, however, Petitioner staked his argument on the impropriety of the solicitor's closing" argument that compared his life to the victim's, which the court found was not prohibited. *Id.* at 375-76, 570 S.E.2d at 167. The court determined because the "comments were not improper," they did "not warrant reversal unless they were so prejudicial that they rendered the sentencing fundamentally unfair." *Id.* at 376, 570 S.E.2d at 167. The court found "the solicitor's closing argument did not render sentencing fundamentally unfair as [it] did not prejudice Petitioner" because "[t]he solicitor's comments were based on evidence already in the record." *Id.*

## III. Curative Instruction

"A curative instruction to disregard incompetent evidence and not to consider it during deliberation is deemed to have cured any alleged error in its admission." *State v. Walker*, 366 S.C. 643, 658, 623 S.E.2d 122, 130 (Ct. App. 2005). In *State v. Vasquez*, the supreme court found the trial court did not err in refusing to grant a mistrial based on the solicitor's closing argument, which mentioned the defendant might escape from prison and kill the State's witnesses, because the trial court's curative instruction cured any prejudice the defendant may have suffered and afforded him a fair trial. 364 S.C. 293, 299-300, 613 S.E.2d 359, 362-63 (2005), *abrogated on other grounds by State v. Evans*, 371 S.C. 27, 637 S.E.2d 313 (2006). In *Copeland*, the supreme court concluded because the defendant's objections the solicitor's closing argument were properly overruled or corrected with a curative instruction, the trial court did not abuse its discretion in denying the defendant's mistrial motion; the comments did not infect the trial with unfairness. 321 S.C. at 325-26, 468 S.E.2d at 625.

In *State v. Wilson*, the defendant objected to certain testimony and moved for a mistrial; the trial court overruled the objection and admitted the testimony. 389 S.C. 579, 585, 698 S.E.2d 862, 865 (Ct. App. 2010). On appeal, the defendant argued the trial court erred in denying his motion for a mistrial. *Id.* at 582, 698 S.E.2d at 864. The State asserted this argument was not preserved because he did not move to strike the testimony, accept or request a curative instruction, or renew his mistrial motion. *Id.* The court recognized an issue is not preserved for review when "the trial court *sustains* a party's objection to improper testimony and the party does not subsequently move to strike the testimony or for a mistrial." *Id.* at 583, 698 S.E.2d at 864. However, the court stated that "when an objection has been *overruled*, the objecting party has suffered an adverse ruling which can be appealed without any further allegation of error." *Id.* at 584, 698 S.E.2d at 864. The court explained a party was not required to accept a curative instruction when a court overruled an objection because the admission of proper evidence did not require a curative charge. *Id.* Accordingly, the court found the defendant properly preserved the issue because the trial court overruled his objection and admitted the testimony; therefore, he was not required to accept a curative charge or make another motion for mistrial. *Id.* at 585, 698 S.E.2d at 865.

## IV. Trial Strategy

"Whe[n] trial counsel articulates a valid reason for employing certain trial strategy, counsel will not be deemed ineffective." *McKnight v. State*, 378 S.C. 33, 43, 661 S.E.2d 354, 359 (2008). "Courts must be wary of second-guessing counsel's trial tactics . . . ." *Whitehead v. State*, 308 S.C. 119, 122, 417 S.E.2d 529, 531 (1992). In *Caprood v. State*, the supreme court found trial counsel articulated a valid trial strategy when he stated "he did not request curative instructions because they tend to bring into focus precisely the item the objector has kept out." 338 S.C. 103, 110, 525 S.E.2d 514, 517 (2000), *abrogated on other grounds by Smalls*, 422 S.C. at 181 n.2, 810 S.E.2d at 839 n.2.

However, in *Brown v. State*, the supreme court found that "although [it did] not believe trial counsel was disingenuous in articulating a trial strategy to explain his failure to object to [certain] comments, [it] f[ou]nd this 'strategy' [could ]not be construed as a valid one given the evident impropriety of the solicitor's remarks." 383 S.C. 506, 517, 680 S.E.2d 909, 915 (2009). The supreme court "h[e]ld trial counsel was deficient in failing to object to the challenged portion of the solicitor's closing argument because it constituted a 'Golden Rule' argument which impermissibly appealed to the passion of the jurors by asking them to 'speak up' for the child victim." *Id.* Nonetheless, the court ultimately determined the petitioner "did not satisfy his requisite burden of proving that there was a reasonable probability that but for counsel's deficient performance the result of his trial would have been different." *Id.* The court noted because "the solicitor's comments came at the very end of his closing argument and were limited in duration," the "comments did not so infect the trial with unfairness as to make the resulting conviction a denial of due process." *Id.*

In *Stone v. State*, 419 S.C. 370, 386, 798 S.E.2d 561, 570 (2017), the supreme court explained the importance of an objection: "Without an objection, however, there can be no debate[,] and the trial court has no opportunity to exercise its discretion." The court recognized that if trial counsel "had objected [to certain testimony], the trial court may have sustained the objection. But in any event, counsel would have at least tested the trial court's discretion." *Id.* "The fact the trial court has such wide discretion does not justify the decision not to object. Rather, the debate that precedes the exercise of that discretion is part of the adversarial process" trial counsel is required to test. *Id.*; *see also Ard v. Catoe*, 372 S.C. 318, 331, 642 S.E.2d 590, 597 (2007) ("When evaluating the reasonableness of counsel's conduct, 'the court should keep in mind that counsel's function . . . is to make the adversarial testing process work in the particular case.'" (quoting *Strickland*, 466 U.S. at 690)).

In *Stone*, the court noted "counsel testified he made the decision not to object for reasons other than the strength of his argument for exclusion. In fact, we read counsel's testimony to say he made the decision not to object *despite* his belief that he had good grounds for the objection." 419 S.C. at 386, 798 S.E.2d at 570. The court found "[t]rial counsel failed to articulate any valid strategic reason for not objecting to important . . . testimony the trial court had the discretion to exclude. Therefore, the decision not to object d[id] not meet an objective standard of reasonableness, and [the PCR applicant] . . . satisfied the first prong of *Strickland*." *Id.* at 387, 798 S.E.2d at 570.

## V. Probative Evidence

An appellate court will not uphold a PCR court's findings when no probative evidence supports them. *Holland v. State*, 322 S.C. 111, 113, 470 S.E.2d 378, 379 (1996). In *Jackson v. State*, 329 S.C. 345, 349, 495 S.E.2d 768, 770 (1998), the supreme court found no probative evidence supported the PCR's court's finding of prejudice. The supreme court determined "no probative evidence was presented at the PCR hearing to show the eyewitnesses and victims were not credible" as "[t]he only 'evidence' that either the victims or eyewitnesses had criminal records were statements and questions by . . . PCR counsel that one of the victims was incarcerated in another state at the time of . . . [the] trial and [the PCR applicant's] testimony that he knew this victim was in jail." *Id.*

In *Chappell v. State*, 429 S.C. 68, 75, 837 S.E.2d 496, 499 (Ct. App. 2019), the PCR court found certain testimony did not contain any vouching statements. On review, this court found the statement "not only had the effect of improperly bolstering the victim's credibility; it also improperly invaded the province of the jury to determine the only issue in th[e] case." *Id.* at 78, 837 S.E.2d at 501. This court found the "statement [could not] reasonably be interpreted to have served any purpose other than to improperly bolster the victim's credibility" and "the PCR court erred in finding [the] testimony contained no vouching statements." *Id.*

In *Lounds v. State*, 380 S.C. 454, 464-65, 670 S.E.2d 646, 651 (2008), the supreme court reversed the PCR court, stating "there [wa]s no probative evidence to support the PCR court's finding[]" trial counsel's "comments were not improper as he was 'simply presenting to the jury an alternate explanation of events that was implied from [the PCR applicant's] own testimony.'"

## VI. Analysis

Here, the solicitor stated that Petitioner "has a *pattern* of robbing old folks, intimidating old folks, kidnapping old folks, holding them up."  (emphasis added).  The facts presented to the jury were that Petitioner robbed Frank and Joan together and no other conduct towards older people was presented to the jury.  At the PCR hearing, the solicitor testified that her reference to a pattern only related to Petitioner's conduct towards the Klems, suggesting that robbing two people at the same time was pattern.  The definition of pattern from *Black's Law Dictionary* relevant here is a "series of acts that are recognizably consistent."  *Pattern*, *Black's Law Dictionary* (11th ed. 2019).  *Merriam-Webster Dictionary*'s definitions of pattern include "a reliable sample of . . . acts" and "frequent or widespread incidence," providing as an example "a *pattern* of violence."  *Pattern*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/pattern. (last visited June 9, 2023).

Both our supreme court and this court have referenced in previous opinions the word pattern without defining it in discussing the existence of a common scheme or plan allowing the State to introduce evidence of prior bad acts in criminal sexual conduct cases.[7]  *See State v. Tutton*, 354 S.C. 319, 328, 580 S.E.2d 186, 191 (Ct. App. 2003) ("[C]ommon scheme or plan evidence in criminal sexual conduct cases will be admitted on a generalized basis only where there is a *pattern* of continuous illicit conduct.  Sex crimes may be unique in this respect because they commonly involve the same victims engaged in repeated incidents occurring under very similar circumstances.  The reason for the general admissibility of such evidence under these circumstances is self evident—where there is a *pattern* of continuous conduct shown, that *pattern* clearly supports the inference of the existence of a common scheme or plan, thus bolstering the probability that the charged act occurred in a similar fashion." (emphases added)); *see, e.g.*, *State v. McClellan*, 283 S.C. 389, 391, 323 S.E.2d 772, 773 (1984) ("[The defendant] was indicted on one count of criminal sexual conduct against his youngest daughter . . . .  All three

---

[7] *See State v. Stokes*, 279 S.C. 191, 193, 304 S.E.2d 814, 814-15 (1983) ("[E]vidence of other 'bad acts' is not admissible to prove the crime charged unless it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; or (5) the identity of the person charged."); *id.* at 193, 304 S.E.2d at 815 ("The 'common scheme or plan' exception requires more than mere commission of two similar crimes by the same person.  There must be some connection between the crimes. If there is any doubt as to the connection between the acts, the evidence should not be admitted.").

daughters testified concerning the *pattern* of this and prior attacks." (emphasis added)); *Tutton*, 354 S.C. at 329-30, 580 S.E.2d at 192 ("[W]e are compelled to find there is no *pattern* of continuous illicit conduct . . . . [T]he determination of the admissibility of the uncharged act rests solely on whether the requisite degree of similarity between the separate acts is present in this case." (emphasis added)); *State v. Weaverling*, 337 S.C. 460, 469, 523 S.E.2d 787, 791 (Ct. App. 1999) ("We find [the victim's] testimony regarding the *pattern* of sexual abuse he suffered by [the defendant] to be quintessential common scheme or plan evidence." (emphasis added)); *see also State v. Perry*, 430 S.C. 24, 67, 842 S.E.2d 654, 677 (2020) (Kittredge, J., dissenting) ("The majority is missing an inferential step—one that is satisfied through either a repeated *pattern* of highly similar *or* unique criminal activity—that being 'where there is a *pattern* of continuous conduct shown, that *pattern* clearly supports the inference of the existence of a common scheme or plan, thus bolstering the probability that the charged act occurred in a similar fashion.'" (first, third, and fourth emphases added) (quoting *Tutton*, 354 S.C. at 328, 580 S.E.2d at 191)); *State v. Cope*, 405 S.C. 317, 356, 748 S.E.2d 194, 214 (2013) (Kittredge, J., concurring in part and dissenting in part) ("I find there is a striking similarity between the facts of this case and the proffered evidence of [the co-defendant's] other sexual assaults. . . . [T]he other four incidents present a compelling *pattern* in terms of time, geography and commonality of features—a *pattern* which is entirely consistent with the facts of this case and material to [the defendant's] theory that [the co-defendant] acted alone." (emphases added)).

In the present case, while the solicitor's comments about a pattern were not in relation to any statute, we find instructive our legislature's definition of pattern, contained in the chapter on offenses against the person, in the article regarding harassment and stalking: "'Pattern' means two or more acts occurring over a period of time, however short, evidencing a continuity of purpose." S.C. Code Ann. § 16-3-1700(D) (2015).

The solicitor stated Petitioner "has a *pattern* of robbing old folks, intimidating old folks, kidnapping old folks, holding them up." (emphasis added). Contrary to the PCR court's finding, this statement can only be reasonably construed as discussing his prior record and therefore the statement was outside the record. *See Vasquez*, 388 S.C. at 458, 698 S.E.2d at 566 (stating a closing argument must stay contained to the evidence within the record or any reasonable inferences drawn therefrom). However, the solicitor explained at trial and at the PCR hearing that the comment should be construed as referring to the two victims in the case for which Petitioner was on trial. The PCR court interpreted the references this way as well. This court defers to the PCR court's findings of fact and must uphold them if any evidence in

the record supports them; however, the court reviews questions of law de novo. *Mangal v. State*, 421 S.C. 85, 91, 805 S.E.2d 568, 571 (2017). Although we defer to the PCR court on credibility matters and accept the court's findings of fact if any evidence supports those findings, the solicitor's testimony at the PCR hearing that her reference to a pattern was not referring to previous crimes and was only referring to the present crimes is not in keeping with the meaning of pattern. While her testimony could support a finding that she intended only to refer to current rather than past crimes, this cannot change that the jury would reasonably assume otherwise from her statement. Accordingly, probative evidence does not support the PCR court's finding that the solicitor's comments on a pattern only referred to the incidents presented to the jury. *See Sellner*, 416 S.C. at 610, 787 S.E.2d at 527 (holding an appellate "[c]ourt gives great deference to the factual findings of the PCR court and will uphold them if there is any evidence of probative value to support them"); *Thompson v. State*, 340 S.C. 112, 115, 531 S.E.2d 294, 296 (2000) ("[A] PCR [court's] findings should not be upheld if there is no probative evidence to support them.").

Here, the solicitor's comments referred to prior criminal convictions not in the record. Although trial counsel moved for a mistrial and the trial court denied the motion, trial counsel did not contemporaneously object during the solicitor's argument. Rather, he waited until after the solicitor finished her closing argument and the trial court dismissed the jury for a brief recess. [8] *See Black*, 319 S.C. at 521-22, 462 S.E.2d at 315 (concluding the defendant's argument regarding a closing argument was not preserved for appellate review because although trial counsel objected and moved for a mistrial during the closing argument, he waited until after the court's charge and the jury retired to deliberate to state the basis for his objection and mistrial motion). Accordingly, trial counsel was deficient for failing to contemporaneously object.

Additionally, trial counsel was deficient for failing to accept a curative instruction. *Compare Wilson*, 389 S.C. at 585, 698 S.E.2d at 865 (concluding the defendant was not required to accept a curative instruction or make another mistrial motion because his objection had been overruled; therefore, the denial of his mistrial motion was preserved), *with State v. Banton*, 387 S.C. 412, 418, 692 S.E.2d 201, 204 (Ct. App. 2010) (noting that when the defendant objected to certain testimony and moved for a mistrial, by rejecting the trial court's offer to give a curative

---

[8] PCR counsel stated Petitioner raised the denial of the mistrial motion issue on direct appeal in an *Anders* brief, and the brief contained a footnote indicating the issue was likely not preserved for direct appeal.

instruction, he failed to preserve the issue of whether he was entitled to a mistrial). Trial counsel expressed a valid strategy for refusing the instruction—he did not want to draw attention to the solicitor's comments. Generally, trial counsel will not be deemed ineffective when he or she has expressed a valid reason for using a particular trial strategy. *McKnight*, 378 S.C. at 43, 661 S.E.2d at 359. In particular, the supreme court has held trial counsel articulated a valid trial strategy for not requesting a curative instruction after his objection to improper testimony was sustained when trial counsel testified he did not request curative instructions because they tended to place more focus on the problem. *Caprood*, 338 S.C. at 109-10, 525 S.E.2d at 516-17. However, in *Brown*, the supreme court found that even though trial counsel genuinely articulated a trial strategy for not objecting to certain comments, the strategy was not valid due to "the evident impropriety of the solicitor's remarks." 383 S.C. at 517, 680 S.E.2d at 915. Trial counsel here believed the solicitor's comments were egregious enough that a mistrial would be granted; therefore, this situation is closer to *Brown*, in that counsel should have known that refusing a curative instruction was not a valid trial strategy.

Here, a curative instruction directing the jury to disregard the pattern comments may have cured any prejudice Petitioner may have suffered from the comments. However, trial counsel refused such instruction, thereby not curing Petitioner's prejudice. Accordingly, we review the pattern comments made at trial to determine if the comments prejudiced Petitioner.

The solicitor's comments here about a pattern fall between *Wiley* and *Huggins*. These comments were more than "a vague reference to [Petitioner's] prior criminal record," contrary to *Wiley* in which the solicitor mentioned the defendant had an unrelated warrant for his arrest and on appeal, this court found even if the jury inferred the defendant committed another crime, the State never attempted to prove the defendant was convicted of another crime. 387 S.C. at 495-96, 692 S.E.2d at 563. We recognize the pattern comments here do not rise quite to the same level of *Huggins*, in which our supreme court found the solicitor's statement during closing arguments the defendant had a plan and offered to pay someone to kill the victim was fundamentally unfair, when no such evidence was presented and there was not overwhelming evidence of guilt. 325 S.C. at 107-08, 481 S.E.2d at 116-17. However, the solicitor's comments about the pattern rise to the level of being so egregious as to warrant a mistrial or "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *See Randall*, 356 S.C. at 642, 591 S.E.2d at 610 (stating a petitioner has the burden of showing the improper argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process"); *Harris*, 382 S.C. at 117, 674 S.E.2d at 537 ("The granting

of a motion for a mistrial is an extreme measure that should only be taken if an incident is so grievous that the prejudicial effect can be removed in no other way.").

Petitioner demonstrated prejudice from trial counsel's failure to contemporaneously object to the solicitor's comments.  Further, the record does not contain overwhelming evidence of Petitioner's guilt.  *See Smalls*, 422 S.C. at 191, 810 S.E.2d at 845 (stating in the context of an ineffective assistance claim, "for the evidence to be 'overwhelming' such that it categorically precludes a finding of prejudice . . . the evidence must include something conclusive, such as a confession, DNA evidence demonstrating guilt, or a combination of physical and corroborating evidence so strong that the [second prong of] *Strickland* . . . cannot possibly be met").  Accordingly, we reverse the PCR's court's denial of Petitioner's application for PCR on the issue of ineffective assistance of counsel for trial counsel's failure to object to the solicitor's references to Petitioner's patterns of behavior during closing arguments and remand to the court of general sessions for a new trial.[9]

---

[9] Based on our disposition, we do not reach the issue of the solicitor's comment asking the jury "[w]ho among us is safe[?]" during closing arguments.  *See Reese*, 370 S.C. at 38, 633 S.E.2d at 901 ("A Golden Rule argument asking the jurors to place themselves in the victim's shoes tends to completely destroy all sense of impartiality of the jurors, and its effect is to arouse passion and prejudice.").  We also do not address Petitioner's alternative request that because the PCR court failed to make any determination on his "[w]ho among us is safe" argument in the order, this court should remand in accordance with *Fishburne v. State*, 427 S.C. 505, 832 S.E.2d 584 (2019), for the PCR court to make specific findings of fact and to expressly state its conclusions of law as required by section 17-27-80 of the South Carolina Code (2014).  The State contends Petitioner's argument that trial counsel was deficient for failing to object to the solicitor's question "[w]ho among us is safe[?]" is not preserved for appellate review because it was not ruled on by the PCR court.  In *Fishburne*, the supreme court determined because PCR cases involve the Sixth Amendment's guarantee to a right to effective assistance of counsel, the court would no longer allow a "procedural shortcoming—such as the failure to file a Rule 59(e) motion—to prevent th[e] [c]ourt from remanding claims of ineffective assistance of counsel when the PCR court's order does not comply with section 17-27-80."  *Id.* at 512, 516, 832 S.E.2d at 587, 589.  Because we reverse the denial of Petitioner's PCR application based on the pattern comments, we need not reach these issues.  *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding an appellate court

**REVERSED.**

**HEWITT and VINSON, JJ., concur.**

---

need not review the remaining issues when its determination of a prior issue is dispositive of the appeal).