**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA
In The Court of Appeals**

Devatee Tymar Clinton, Petitioner,

v.

State of South Carolina, Respondent.

Appellate Case No. 2019-001272

Appeal From Lancaster County
R. Knox McMahon, Trial Judge
Paul M. Burch, Post-Conviction Relief Judge

Unpublished Opinion No. 2024-UP-129
Heard February 6, 2024 – Filed April 17, 2024

**REVERSED AND REMANDED**

Appellate Defender Jessica M. Saxon, of Columbia, for Petitioner.

Alan McCrory Wilson, Assistant Attorney General D. Russell Barlow, II, and Assistant Attorney General Talida Balaj, all of Columbia, for Respondent.

**PER CURIAM:** We issued a writ of certiorari to review the post-conviction relief (PCR) court's denial of Devatee Tymar Clinton's application for PCR on the issue

of whether defense counsel was ineffective for failing to proffer exculpatory evidence.  We reverse.

**FACTS**

On January 19, 2012, Jenika Jones (Victim) was killed during a home invasion.  The intruder shot Victim at close range in the den of her small mobile home.  One investigator testified "there was blood everywhere" when he discovered Victim.

Three of Victim's children, one-year-old AR; two-year-old AS; and four-year-old AN, were at the home during the crime.  Although the children were bloody when officers arrived at the scene, they did not suffer any injuries.  Officers found AR "standing right next to [Victim's] face" and another child sitting by Victim's feet.  AN had blood on him, but he did not have "nearly as much as the other two."  Officers discovered the children's footprints in Victim's blood.  The footprints created a pathway from the den to a bedroom, indicating at least one of the children made several trips between those two rooms.  The master bedroom, which was "ransacked," was the only other room the intruders disturbed.  One of the children alerted a neighbor, who called the police.

During a pretrial hearing, the State sought to exclude any testimony regarding AN stating the following to investigators or EMS workers: "Shi's daddy shot my momma," "Jamia's daddy hurt my momma," or "Shortycake shot my momma."[1]  Clinton argued the statements were admissible under Rule 803(2), SCRE, the excited utterance exception to the hearsay rule.  The State argued any exception to the hearsay rule required the defense to show the declarant, a four-year-old child, was a competent witness.  After taking the matter under advisement, the trial court determined a finding of AN's competency was not required and the statements met the admissibility factors for the excited utterance exception to the hearsay rule.  However, the court ruled the defendants[2] were required to "lay the foundation" for the testimony during trial.

Trial testimony revealed the defendants were close friends.  Green knew Victim because Green, Victim, and Green's sister lived in an apartment together prior to

---

[1] Shortycake is a nickname for Rashad Johnson, Shi's father.  Jamia and Shi are names for the same person, a child close in age to AN.  Johnson was initially considered a person of interest in the investigation; however, the State never charged him with a crime in relation to this case.

[2] Clinton was tried with his co-defendant, Al Martinez Green.

Victim's move to the mobile home park.  Further, Clinton's grandmother, whom he lived with occasionally, lived in the mobile home next door to Victim.

A witness testified that on the day before Victim's murder, the defendants discussed "doing a lick," indicating their intention to commit a robbery.  Green allegedly mentioned a female, questioning, "Does she drive a black car," without indicating who "she" referred to.  Additionally, Clinton allegedly stated "he had [an unrelated male's] gun."  Another witness testified that later that night, he saw the defendants, and Clinton asked that witness and Green if they wanted to "go on a lick" with him.  According to that witness, Green "was down for it.  You know what I am saying.  He was like, yeah, he's ready."

Wayne Blakeney, a relative of Clinton,[3] testified that on January 19, 2012, the day of Victim's murder, Clinton, Green, and Delrico McDow borrowed a white Cadillac from a male later identified as Pomp Blackmon, a local community member.[4]  Blakeney drove the group to a club where Clinton allegedly asked Blakeney to "take him to get some money."  Thereafter, the group—Blakeney, Clinton, Green, and McDow—left the club, and Clinton directed Blakeney to drive to Victim's mobile home park.  Clinton had a gun in his possession.

Blakeney testified that the defendants and McDow exited the car, disappeared for approximately ten minutes, and returned quickly, in a "bit of a hurry."  Blakeney sped out of the mobile home park and drove the group back to the club.  After staying at the club for a while, Blakeney drove the group home.  During the drive home, with only Clinton and Blakeney in the car, Clinton allegedly asked Blakeney if he "could keep a secret" and when Blakeney responded in the affirmative, Clinton stated, "I killed that 'B'."  Blakeney then dropped Clinton off at Clinton's grandmother's house in the same neighborhood where the crime occurred.  Clinton told Blakeney he left the gun in the glove compartment and asked Blakeney to hold on to it.  Shortly thereafter, Blakeney abandoned the car in a Piggly Wiggly grocery store parking lot because it had a flat tire.[5]

Two witnesses testified that at approximately 9:30 or 10:00 p.m. on January 19, 2012, they noticed an older, small white "Oldsmobile, Buick, [or] Cadillac style"

---

[3] Blakeney was unsure of the familial relation he shared with Clinton; however, he stated he was "pretty sure [they were] close kin."

[4] Blakeney and McDow were also charged in relation to Victim's murder.  Their cases are not the subject of this appeal.

[5] The Piggly Wiggly was less than a mile from Victim's mobile home park.

car, or "white Cadillac with a rag top," with no headlights on, driving at a rapid speed out of Victim's mobile home park as the witnesses drove into the neighborhood.  One of the witnesses stated she saw the same car the following day in the Piggly Wiggly parking lot with a flat tire.

Pomp Blackmon confirmed that in January 2012, he owned a 1991 eggshell white Cadillac Seville that had a rag top.  He also confirmed that he loaned the Cadillac to a group of males on January 19, 2012.  After the men did not return his car that evening, Blackmon searched for the car the next day.  He found his car in the Piggly Wiggly parking lot with a flat tire.  He discovered a blue jumpsuit and a work identification card[6] in the backseat of the car.

Vivian Stradford, who knew Clinton and Victim, saw Clinton on January 19, within a few hours after she was notified of Victim's death.  Stradford saw Clinton at a gas station within walking distance of the club Clinton, Green, Blakeney, and McDow attended that night.[7]  She testified Clinton did not respond when she told him Victim was killed earlier that evening.  She also testified Clinton was wearing a blue jumpsuit that night and he regularly wore one.  Stradford identified the jumpsuit found in Blackmon's car as Clinton's jumpsuit.

Detective Frederick Thompson, of the Lancaster County Sheriff's Office, testified Clinton admitted to the police that he wore a camouflage jumpsuit on the night of the murder.  Thompson also testified Clinton admitted the blue jumpsuit was his; however, he contended he did not wear the jumpsuit that evening and had loaned it out on different occasions.

After the State rested, both defendants renewed their motions for directed verdicts, which the trial court denied.  The jury convicted them both of murder, and the trial court sentenced them to life imprisonment without the possibility of parole.  In his direct appeal, Clinton argued the trial court erred in failing to admit AN's statements pursuant to the excited utterance or present sense impression exceptions to the rule against hearsay.  This court affirmed in a summary opinion, *State v. Clinton*, Op. No. 2016-UP-206 (S.C. Ct. App. filed May 11, 2016), finding the issue was not preserved.  Clinton filed an application for PCR, alleging, *inter alia*, ineffective assistance of counsel arising from counsel's failure to preserve the

---

[6] The name of the person on the identification card was not included in the record.
[7] The record suggests Clinton walked to the gas station while the rest of the group remained at the club.

issue. The State filed a return. Clinton filed an amended petition, raising three issues.[8]

At the PCR hearing, trial counsel testified the trial court ruled the evidence was admissible if a proper foundation was laid. When counsel was examining the police officer who heard AN's statements, the trial court then "inexplicably said that [it] wasn't going to allow [counsel] to go further into the questioning." Counsel claimed he again attempted to get the statement in later during the trial and the trial court "shut it down again." Counsel testified he was baffled by this court's opinion finding the issue was not preserved. Counsel admitted he did not proffer the testimony. Counsel testified there was no DNA evidence tying Clinton to the scene; the majority of the State's case was based on the biased testimony of co-defendant Wayne Blakeney's testimony; and he possibly should have had a forensic child interview conducted. By order filed July 26, 2019, the PCR court denied PCR and dismissed Clinton's application.

In its order, the PCR court found trial counsel's strategy, to get the statement into evidence through cross-examination of the first responders, was reasonable. The court found counsel believed the only other way to introduce the statements would be to call the child to testify, which he did not want to do. He testified that in hindsight, he could have proffered the testimony, but at the time, he decided to move on with his cross-examination. Counsel stated that even in hindsight, he would not have wanted to proffer the testimony because the child had gone through a traumatic event and counsel was unsure what the child would say.

The PCR court found that although counsel did not proffer the testimony, the court would "not second-guess trial counsel's decision to move on." The court found "[b]ecause trial counsel articulated reasonable trial strategy for attempting to elicit the child's out-of-court statement, . . . he was not deficient." The court denied the petition and dismissed Clinton's application.

Clinton filed this petition for a writ of certiorari. By order dated January 9, 2023, this court granted certiorari on the following issue:

> [Whether t]he PCR court erred by ruling defense counsel
> was not ineffective where counsel failed to proffer and
> argue that the identification statements of the victim's

---

[8] Clinton filed a prior application, which our supreme court denied and remitted on August 4, 2017. Clinton then timely filed these applications.

four-year-old son made shortly after the shooting that specifically named someone other than Petitioner as the murderer were admissible as "excited utterances" or "present sense impressions" where the Court of Appeals found the error excluding these statements unpreserved because counsel failed to proffer this testimony at trial.

## STANDARD OF REVIEW

"In [PCR] proceedings, the burden of proof is on the applicant to prove the allegations in his application." *Speaks v. State*, 377 S.C. 396, 399, 660 S.E.2d 512, 514 (2008). "We defer to a PCR court's findings of fact and will uphold them if there is evidence in the record to support them." *Smalls v. State*, 422 S.C. 174, 180, 810 S.E.2d 836, 839 (2018). "We review questions of law de novo, with no deference to trial courts." *Id.* at 180-81, 810 S.E.2d at 839.

## LAW/ANALYSIS

Clinton argues the PCR court erred in dismissing his PCR application because trial counsel's failure to preserve the issue of the trial court's exclusion of the exculpatory statements made by AN was both deficient and his deficiency caused prejudice. We first find counsel's performance was deficient.

Initially, we conclude the trial court correctly determined AN's statements—"Shi's daddy shot my momma," "Jamia's daddy hurt my momma," or "Shortycake shot my momma"—met the admissibility requirements for an excited utterance exception to the hearsay rule. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c), SCRE. The rule against hearsay prohibits the admission of evidence of an out-of-court statement to prove the truth of the matter asserted unless an exception to the rule applies. Rule 802, SCRE. An excited utterance is not excluded by the hearsay rule, even though the declarant is available as a witness. Rule 803(2), SCRE. An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *Id.* In *State v. Washington*, our supreme court explained:

> Three elements must be met in order for a statement to be an excited utterance: (1) the statement must relate to a startling event or condition; (2) the statement must have

been made while the declarant was under the stress of excitement; and (3) the stress of excitement must be caused by the startling event or condition.

379 S.C. 120, 124, 665 S.E.2d 602, 604 (2008). "In determining whether a statement falls within the excited utterance exception, a court must consider the totality of the circumstances." *State v. Sims*, 348 S.C. 16, 20, 558 S.E.2d 518, 521 (2002).

We agree the statements qualified as excited utterances. The statements related to the startling event of AN seeing his mother lying in a pool of blood and his younger siblings standing by her "saturated" in blood. *See id.* at 21, 558 S.E.2d at 521 ("The statement here clearly meets the first element because it relates to the startling event of the [five-year-old] son seeing his mother *after she was attacked and possibly while she was being attacked*." (emphasis added)). The statements were made while AN was under the stress of excitement as he made the statements within hours of Victim's death. *See id.* at 23, 558 S.E.2d at 522 (finding the child "was under the continuing stress of excitement when he told [an officer] appellant was in the home the night of [his mother's] attack" even though twelve hours had passed between the time of the attack and time of the child's statement to the officer). Finally, we find the evidence shows the stress of excitement was caused by the startling event or condition. *See id.* at 21, 558 S.E.2d at 521 ("As for the third element, if the son was under the stress of excitement, then that stress was caused by the startling event of seeing his mother being attacked and not being able to wake her.").

"Statements which are not based on firsthand information, as where the declarant was not an actual witness to the event, are not admissible under the excited utterance or spontaneous declaration exception to the hearsay rule." *State v. Hill*, 331 S.C. 94, 99, 501 S.E.2d 122, 125 (1998) (quoting 23 C.J.S. *Crim.Law* § 876 (1989)). Here, although the record does not include direct evidence showing AN witnessed the shooting, we conclude AN's personal knowledge of the shooting can be inferred from the totality of the circumstances. Substantial circumstantial evidence suggests AN witnessed the intruder shoot his mother. By identifying the shooter in the statements, it can be inferred from the statements that AN observed the shooter. Accordingly, we find the statements were excited utterances and based on firsthand information; thus, they met the admissibility requirements for excited utterances.

We next turn to whether Clinton's counsel was deficient for failing to proffer the statements to preserve the issue for appellate review after the trial court refused to allow the statements to be admitted. "In post-conviction proceedings, the burden of proof is on the applicant to prove the allegations in his application." *Speaks*, 377 S.C. at 399, 660 S.E.2d at 514. "A criminal defendant is guaranteed the right to effective assistance of counsel under the Sixth Amendment to the United States Constitution." *Taylor v. State*, 404 S.C. 350, 359, 745 S.E.2d 97, 101 (2013). To establish a claim of ineffective assistance of counsel, a PCR applicant must show (1) counsel was deficient and (2) counsel's deficiency prejudiced the defendant's case. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To demonstrate deficiency, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-88.

Clinton argues the PCR court erred in finding counsel's failure to proffer the testimony was not deficient because even if counsel's strategy for admitting the statements was valid, it did not excuse the failure to proffer the statements. We agree. "Counsel's performance is accorded a favorable presumption, and a reviewing court proceeds from the rebuttable presumption that counsel 'rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Smith v. State*, 386 S.C. 562, 567, 689 S.E.2d 629, 632 (2010) (quoting *Strickland*, 466 U.S. at 690). "Accordingly, when counsel articulates a valid reason for employing a certain strategy, such conduct will not be deemed ineffective assistance of counsel." *Id.* "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. However, where counsel's strategy is not sound, counsel's performance may be found to be deficient. *Stone v. State*, 419 S.C. 370, 384, 798 S.E.2d 561, 569 (2017) (stating "counsel's decision to employ a certain strategy will be deemed unreasonable . . . if the reasons given for the strategy are not sound").

Here, we find counsel's failure to proffer the exculpatory evidence constituted deficient performance and the reasons given were not sound. Failure to preserve an issue for appellate review may be deemed deficient performance. *See Foye v. State*, 335 S.C. 586, 590, 518 S.E.2d 265, 267 (1999) (finding trial counsel was deficient for failing to place his argument about the jury seeing his client in chains on the record and thus failing to adequately preserve the issue for appeal). When asked if he failed to protect the record by not proffering the officer's testimony, counsel testified, "It wasn't my objection. The State made the objection. I tried to get the statement in, and the [trial court] ruled it inadmissible." Counsel continued,

stating "I am still baffled by the Court of Appeals' ruling. . . . I couldn't preserve an objection I didn't make." Counsel then admitted he did not proffer what the officer's testimony would have been and testified he disagreed with the Court of Appeals' opinion finding the issue not preserved because the evidence was not proffered.

Counsel later testified he did not hire a forensic interviewer to interview AN because he would be faced with cross-examining a young child. During cross-examination, counsel testified he "believed we were on good footing with the hearsay exception. It was an excited utterance. I still believe that to this day." Counsel was asked, "[w]ould the only other thing you could have done . . . be to call the child and put him on the stand?" Counsel responded, "I suppose so. . . . I didn't want to put the child on the stand." The PCR court stated, "The [PCR c]ourt finds trial counsel's strategy to elicit the child's out-of-court statement through cross-examination reasonable. . . . The [c]ourt further finds trial counsel's decision not to proffer the child's testimony reasonable. . . . While trial counsel arguably needed to proffer the child's testimony to preserve the issue for appellate review, the [PCR c]ourt will not second-guess trial counsel's decision to move on with his questioning."

We find counsel's failure to recognize that he could proffer the evidence through the testimony of the responding officer rather than by calling the child to testify was deficient performance. *See State v. Jackson*, 384 S.C. 29, 34, 681 S.E.2d 17, 19–20 (Ct. App. 2009) (finding the defendant failed to preserve the issue of the trial court's exclusion of evidence objected to by the State because the defendant failed to proffer the excluded testimony). In addition, we find the PCR court erred in finding counsel's strategy, to get the statement into evidence through cross-examination of the first responders rather than call the child as a witness, did not excuse his failure to proffer the evidence.

We next turn to the prejudice prong of a claim of ineffective assistance of counsel. Clinton argues trial counsel's failure to preserve the issue of the trial court's exclusion of AN's excited utterances prejudiced him. He first notes there was no forensic evidence that linked him to the murder. He also argues the majority of the State's case relied on the testimony of a co-defendant, Blakeney, and that Blakeney was biased "as he stood to gain, and did in fact receive, a great benefit in return for testifying against" Clinton.

Establishing ineffective assistance of counsel requires an applicant to show not only counsel's performance was deficient, but that "counsel's deficient performance

prejudiced the applicant's case." *Speaks*, 377 S.C. at 399, 660 S.E.2d at 514 (citing *Strickland*, 466 U.S. at 687). To establish prejudice, "a PCR applicant must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Bennett v. State*, 383 S.C. 303, 309, 680 S.E.2d 273, 276 (2009) (quoting *Cherry v. State*, 300 S.C. 115, 117–18, 386 S.E.2d 624, 625 (1989)). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The State's case turned on witness credibility, and the State failed to produce strong evidence other than Blakeney's testimony. Thus, because there is a reasonable probability that the outcome of Clinton's trial would have been different if the excited utterances naming another person as the perpetrator had been admitted (or properly proffered), we find Clinton has established both deficiency and prejudice.

**CONCLUSION**

Based on the foregoing, the PCR court's order is

**REVERSED and REMANDED.**

**THOMAS, MCDONALD, VERDIN, JJ., concur.**